**STATE of Minnesota, Respondent,**

v.

**William John HOGETVEDT, Appellant.**

No. CX–00–771.

Court of Appeals of Minnesota.

March 27, 2001.

Mike Hatch, Attorney General, St. Paul, MN; and Amy Klobuchar, Hennepin County Attorney, Linda K. Jenny, Assistant County Attorney, Minneapolis, MN, (for respondent).

Lawrence Hammerling, Deputy State Public Defender, Michael F. Cromett, Assistant State Public Defender, Minneapolis, MN, (for appellant).

William J. Hogetvedt, MCF—Stillwater, Bayport, MN, (pro se appellant).

Considered and decided by RANDALL, Presiding Judge, PETERSON, Judge, and SHUMAKER, Judge.

## OPINION

R.A. RANDALL, Judge

Appellant William John Hogetvedt was convicted of third-degree assault. Appellant argues that (1) the district court erred by admitting the victim's out-of-court statements identifying appellant as her assailant under Minn. R. Evid. 803(2) (excited utterance exception) and Minn. R. Evid. 803(24) (residual exception); (2) appellant was denied his due process right to a fair trial because the state's witnesses volunteered testimony that the court had already ruled inadmissible; and (3) the district court erred by imposing a consecutive sentence without calculating the duration using a zero criminal-history score and by departing without substantial and compelling reasons. Appellant also argues pro se that (1) the evidence was insufficient to sustain his conviction; (2) the prosecutor committed misconduct by injecting personal opinion, making disparaging remarks about appellant, inflaming the jury's passions, and misrepresenting the evidence; and (3) he received ineffective assistance of counsel. We reverse and remand.

## FACTS

On March 28, 1999, P.M.H. had an argument with appellant, who is also her son, because appellant was upset that P.M.H had not informed him that his sister delivered a baby earlier in the day. P .M.H. told appellant to leave her house, and he complied. A short time later, around 7:30 p.m., P.M.H. heard a knock at her door, but she did not answer it. The events that followed are in dispute.

According to appellant, he left P.M.H's house but came back a few minutes later after noticing a suspicious vehicle in front of P.M.H.'s house. When he came back, the door had been kicked in, and he discovered that P.M.H. had been assaulted. He attempted to help P.M.H., but she refused. Appellant went to a friend's house and asked his friend to check on P.M.H. Once the friend arrived at P.M.H's house, she refused his help as well. The friend drove P.M.H to her other son's home. Her son drove her to the hospital where she was

treated for multiple facial fractures. After the assault, appellant told his brother that he thought a group of "Mexicans" was responsible for P.M.H's assault.

According to P.M.H.'s original version of the events, she told several people, including police officers, medical personnel, and her children, that appellant assaulted her. Although P.M.H. did not deny making these statements, she later changed her story and reported that appellant did not assault her. She asserted that she did not know who assaulted her, but she remembered hearing several voices, some of them with "Mexican" accents.

On April 26, 1999, appellant was charged with third-degree assault. After the jury returned its guilty verdict, the district court departed from the permissible-presumptive-consecutive sentence, based on appellant's separate conviction of a crime against a person in Isanti County. The court sentenced appellant to 60 months. Appellant appeals both his conviction and his sentence.

## ISSUES

I. Did the district court err by admitting the victim's out-of-court statements, which identified appellant as her assailant, under the excited utterance and the residual-hearsay rule exceptions?

II. Was appellant denied his due-process right to a fair trial because two of the state's witnesses volunteered testimony that the district court had previously ruled inadmissible?

III. Did the district court err by imposing a consecutive sentence without calculating the duration using a zero criminal-history score?

IV. Based on pro se appellant's arguments:

A. Was there sufficient evidence to sustain appellant's conviction?

B. Did the prosecutor commit misconduct by injecting personal opinion, making disparaging remarks about appellant, inflaming the jury's passions, and misrepresenting the evidence?

C. Did appellant receive ineffective assistance of counsel?

## ANALYSIS

### I. Out-of-Court Statements

■ Evidentiary rulings generally rest within the district court's discretion and will not be reversed absent an abuse of that discretion. *State v. Shannon,* 583 N.W.2d 579, 583 (Minn.1998). On appeal, the party claiming error in the district court's ruling has the burden of demonstrating "both the error and the prejudice resulting from the error" and a "reversal is warranted only when the error substantially influences the jury to convict." *State v. Darveaux,* 318 N.W.2d 44, 48 (Minn. 1982) (quotation omitted).

### A. Excited Utterance Hearsay Exception

■ Appellant argues that the district court erred by admitting as substantive evidence P.M.H's out-of-court statements to her daughter and to Officer Blackey identifying appellant as her assailant, which were made while at the hospital on the night of the incident. Appellant contends that, contrary to the district court's ruling, P.M.H's statements do not meet the excited-utterance exception under Minn. R. Evid. 803(2) because too much time elapsed between the incident and the statements.

First of all, the district court did not have to reach the excited-utterance analysis. Hearsay is "a statement, other than one made by the declarant while testifying at [trial], offered in evidence to prove the

truth of the matter asserted." Minn. R. Evid. 801. A statement is *not hearsay* if the declarant testifies at trial

and is subject to cross-examination concerning the statement, and the statement is * * * (C) *one of identification of a person made after perceiving the person,* if the [district] court is satisfied that the circumstances of the prior identification demonstrate the reliability of the prior identification, or (D) a statement describing or explaining an event * * * made while the declarant was perceiving the event * * * or immediately thereafter.

Minn. R. Evid. 801(d)(1) (emphasis added).

In this case, P.M.H.'s statements to her daughter and to Officer Blackey identified appellant as her assailant and described the event soon after the assault occurred. These statements are not hearsay. Minn. R. Evid. 801(d)(1).

■ The district court, however, did not admit the statements under Minn. R. Evid. 801(d)(1). Instead, the court determined that P.M.H.'s statements qualified as an excited utterance exception to the hearsay rule. An excited utterance is defined as a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Minn. R. Evid. 803(2). Relevant factors in determining whether an out-of-court statement qualifies as an excited utterance include "the length of time elapsed, the nature of the event, the physical condition of the declarant, and any possible motive to falsify." *State v. Daniels,* 380 N.W.2d 777, 782–83 (Minn.1986) (quotation omitted).

■ The lapse of time between the startling event and the out-of-court statement is not always determinative. *Daniels,* 380

N.W.2d at 783. P.M.H. was assaulted around 7:30 p.m. and was taken to the hospital an hour later. Her jaw was broken in two places; she sustained other facial fractures, including a fractured eye socket; and she was in severe pain. Because of P.M.H.'s injuries, she was under heavy medication. P.M.H. made her statement to Officer Blackey around 11 p.m., and she made her statement to her daughter sometime before speaking with Officer Blackey. While three hours had passed between the assault and the statements, given the extent of P.M.H.'s injuries and the nature of the assault, it is reasonable to conclude that she was still under stress from the incident. Further, P.M.H. testified at trial and was subject to cross-examination concerning her out-of-court statements. Since the statements at issue were admissible as witness identification statements, although the district court erred in construing them as hearsay, it is a moot point. Given these facts, the district court did not err by ruling that P.M.H.'s out-of-court statements to her daughter and to Officer Blackey that appellant assaulted her could be admitted as evidence.

### B. Residual–Hearsay Exception

■ Appellant argues the district court erred by admitting, as substantive evidence, P.M.H.'s taped out-of-court statement to Sergeant Christiansen on the morning after the incident in which P.M .H. indicated appellant assaulted her. Appellant contends that, contrary to the district court's ruling, P.M.H's statement does not satisfy the residual-hearsay exception under Minn. R. Evid. 803(24).[1]

■ P.M.H.'s taped out-of-court statement to Sergeant Christiansen is not hearsay. P.M.H. testified at trial and was subject to cross-examination, and her

1. Minn. R. Evid. 803(24) provides that an out-of-court statement, which is not covered by any other hearsay exception, will be excepted

from the hearsay rule if it has "equivalent circumstantial guarantees of truthworthiness."

statement concerned the "identification of a person made after perceiving the person." Minn. R. Evid. 801(d)(1)(C). The district court, again, did not admit P.M.H.'s out-of-court taped statement under Minn. R. Evid. 801(d)(1)(C). Instead, the court determined that P.M.H.'s taped statement qualified as a residual exception to the hearsay rule under Minn. R. Evid. 803(24). This exception is not favored in the law. Because we find that P.M.H.'s taped out-of-court-statement was not hearsay under Minn. R. Evid. 801(d)(1)(C), we do not have to reach the residual exception under Minn. R. Evid. 803(24).

## II. Improper Testimony

Appellant asserts that during direct examination (a) P.M.H. improperly testified about appellant's custodial status, and (b) Sergeant Christiansen, in an effort to prejudice the jury, improperly stated his opinion that appellant was guilty of assaulting P.M.H. Appellant argues that this testimony, which the witnesses testified to despite the district court's earlier ruling that such testimony was inadmissible, denied him his "constitutional right to due process and a fair trial."

■■■ Jury exposure "to potentially prejudicial material creates a problem of constitutional magnitude, because it deprives a defendant of the right to an impartial jury." *State v. Cox*, 322 N.W.2d 555, 558 (Minn.1982) (citation omitted). The state has a duty to ensure that its witnesses know the limits of permissible testimony. *State v. Underwood*, 281 N.W.2d 337, 342 (Minn.1979). When analyzing whether a defendant has been deprived of the right to an impartial jury because of potentially prejudicial matters that inadvertently come before a criminal jury, the relevant factors this court should consider in an independent evaluation of the verdict include:

> the nature and source of the prejudicial matter, the number of jurors exposed to

the influence, the weight of evidence properly before the jury, and the likelihood that curative measures were effective in reducing the prejudice.

*Cox*, 322 N.W.2d at 559.

During pretrial, appellant moved to exclude any reference to appellant's custodial status and to exclude any opinion testimony, specifically from Sergeant Christensen, as to whether appellant was guilty of assault. Regarding appellant's custodial status, the district court ruled:

> [U]nless it is necessary for the jury to become aware of [appellant's] custodial status because of the admission of some other pieces of evidence, I don't want any general references by any witness coming into this courtroom talking about [appellant] being in prison or anything of that nature. * * * And I expect the County Attorney to caution any of the State's [witnesses] to that effect.

Regarding opinion testimony as to whether appellant was guilty of assault, the district court ruled:

> Certainly with regard to the issue of *Sergeant Christensen* making statements as to his opinion as to [appellant's] guilt, *that would be totally improper.* And I expect you to caution *Sergeant Christensen* when he testifies that such opinions are his alone and are to be kept to himself.

(Emphasis added.)

During P.M.H.'s direct examination, the prosecutor asked, "How long after the assault in March was it until you had phone contact with [appellant]?" P.M.H. replied, "That wasn't up until he was arrested in Isanti and he was going to trial up in Isanti." Immediately after this testimony, appellant requested a mistrial. He believed that the statement was highly prejudicial because it referred to appellant's custody status and that jury instructions would not sufficiently repair the harm.

The court ruled that P.M.H.'s reference was to an arrest in Isanti and a trial in Isanti, but that she had not referenced appellant's custodial status. Thus, the court instructed the jury to disregard P.M.H's answer as nonresponsive and instructed it *not* to consider the answer when assessing the issues of the case.

During Sergeant Christensen's direct examination, the prosecutor elicited the following testimony:

Q: And why did [P.M.H.] call you?

A: She stated that she was not sure of what was going on with the case. And that she was changing her mind about * * * the whole thing.

Q: Did she make any statements regarding [appellant]?

A: She just said that it wasn't * * * [appellant] who had assaulted her.

Q: And what was your response when she said that?

A: Well, I told her * * * that *I believed it was [appellant] that assaulted her.*

(Emphasis added.) After appellant objected, the court ruled that Sergeant Christensen's answer be stricken from the record. Additionally, the court instructed the jury that Sergeant Christensen's opinion was not evidence and that only the jury's opinion in the case mattered. Further, as part of its final jury instructions, the court advised:

During trial I have ruled on objections to receiving certain testimony * * * in evidence. * * * [Y]ou are to disregard all evidence that has been stricken from the record.

■ Standing alone, P.M.H.'s testimony might not have prevented appellant from receiving a fair trial. That testimony is barely relevant, if at all, to the state's case. It could be classified as prejudicial because of the negative inference, but, by itself, we do not find reversible error. The court correctly stated that P.M.H. did not explicitly refer to appellant's custodial status; instead, she merely referenced his arrest and trial. Potential harm that could have arisen from the jury's inference regarding appellant's custodial status based on P.M.H's statement was adequately cured by the court's jury instruction to disregard P.M.H's answer as nonresponsive.

■ However, Sergeant Christensen's testimony is egregious. In essence, he told the jury he believed appellant was guilty of assaulting P.M.H. The district court emphasized that opinion testimony of this nature would be "totally improper" when it made its pretrial in camera ruling. The district court specifically instructed the prosecuting attorney to caution Sergeant Christensen that he should keep any opinion as to guilt to himself. This ruling of the district court was disregarded and Sergeant Christensen's opinion as to guilt went to the jury. Given Sergeant Christensen's status as a police officer, he may have unduly influenced the jury. The court's ruling to strike that portion of his testimony and provide a curative jury instruction may not have been effective in reducing this prejudice.

The district court specifically instructed the state to counsel Sergeant Christensen regarding permissible testimony. The state had an obligation to follow through with the court's instruction. We can only conclude that either Sergeant Christensen intentionally ignored the court's instruction, or the state's attorney failed to follow the court's specific instruction. By definition, it has to be one or the other. We dismiss the state's argument that Sergeant Christensen "did not express any personal opinion" that appellant was guilty. A review of Sergeant Christensen's testimony demonstrates that he did express his personal opinion as to who

assaulted the victim, and that makes his testimony particularly harmful. Because Sergeant Christensen's testimony was prejudicial, appellant is entitled to a new trial. *See State v. Flowers*, 261 N.W.2d 88, 89 (Minn.1977) (stating when prosecutors and police officers try to inject into "trial indirectly matters which they know they cannot introduce directly, the only solution is to * * * try the case over").

## III. Consecutive Sentence Calculation

 Because we are reversing and remanding this case for a new trial, we do not have to reach this issue. However, we point out that both parties agree the district court erred by failing to calculate appellant's two consecutive sentences using a zero criminal-history score. *See* Minn. Sent. Guidelines II.F (providing that a zero criminal-history score or mandatory minimum for offense, whichever is greater, must be used in determining presumptive duration for permissive-consecutive sentences). Appellant should have received one year and one day for a permissive consecutive sentence.

## IV. Pro Se Arguments

Appellant argues that (1) because P.M.H. retracted her assertion that appellant assaulted her, there is no evidence on which the jury can rely to establish his identity as her assailant; (2) the prosecutor committed misconduct in his closing argument by injecting his personal opinion regarding witness credibility, disparaging the defense, and inflaming the jury's passions; and (3) he received ineffective assistance of counsel.

Because we are reversing and remanding this case for a new trial, we do not address appellant's pro se arguments.

## DECISION

Appellant was denied a fair trial when the state's witness, a police officer, disre-

garded a specific court instruction to refrain from testifying as to his personal opinion regarding appellant's guilt. The district court erred by imposing two consecutive sentences without calculating the duration using a zero criminal-history score.

**Reversed and remanded.**

In re the Marriage of Michael
J. LEMCKE, Petitioner,
Respondent,

v.

Dayna P. LEMCKE, Appellant.

No. C0–00–1170.

Court of Appeals of Minnesota.

April 3, 2001.

J. Richard Stermer, Prindle, Maland, Sellner, Stennes & Knutsen, Ch., Montevideo, MN, (for respondent).

William E. Mullin, Melissa M. Weldon, Maslon, Edelman, Borman & Brand, LLP, Minneapolis, MN, (for appellant).

Considered and decided by LANSING, Presiding Judge, ANDERSON, Judge, and HALBROOKS, Judge.

## OPINION

LANSING, Judge

Dayna Lemcke appeals from a dissolution judgment providing that Michael Lemcke have sole physical custody of Dylan, the Lemckes' four-year-old son. Dayna Lemcke claims that, as a matter of law, the district court abused its discretion in allowing Michael Lemcke to have sole physical custody notwithstanding its finding that he had initially attempted to alienate Dylan from her and her extended family. Because in determining that Michael

Lemcke would have sole physical custody the district court properly weighed all the relevant statutory factors, including Michael Lemcke's attempt to alienate Dylan from his mother, we affirm.

## FACTS

Dayna Lemcke and Michael Lemcke were married in 1985. Their son Dylan was born in February 1996. When the Lemckes separated in June 1999, Dayna Lemcke moved out of the home and agreed to leave Dylan with his father. The Lemckes worked out an interim shared-custody arrangement whereby Dylan spent alternating weeks with each parent. Kelly Lemcke, Michael Lemcke's daughter from a previous marriage, and Jacie Foss, Dayna Lemcke's niece, also stayed with Michael Lemcke. Kelly and Jacie, now 18 and 17 years old respectively, lived with the Lemckes throughout their 14-year marriage.

After the Lemckes separated, Michael Lemcke told Kelly and Jacie that Dayna Lemcke did not want to be married to him anymore. He also stated that Dayna Lemcke wanted "the party life" and would not be able to provide the structure and stability the girls needed. In Dylan's presence, Michael Lemcke said Dylan would not get the attention he needed if he lived with his mother. Also in Dylan's presence, Michael Lemcke talked to Dylan's daycare provider about the Lemckes' marital problems. But the daycare provider testified she could not recall Michael Lemcke making any negative or derogatory comments about Dayna Lemcke. She also stated she had not seen Michael Lemcke interfere with Dylan's relationship with his mother.

The breakup of the family was difficult for Dylan and the girls. Dayna Lemcke testified that after the Lemckes separated, Dylan became estranged and had difficulty showing affection for her in his father's presence. She also testified that Dylan had stated he did not like her, Jacie, or his maternal grandmother. Dylan claimed that his father and Kelly had told him to feel that way. Dayna Lemcke added that Michael Lemcke had been rigid about Dylan's schedule and had twice refused to let Dylan stay with her when he was unable to care for him, opting instead to leave him with a babysitter. Michael Lemcke denied trying to alienate Dylan from his mother and her family and noted that Dylan had expressed negative feelings about them before the separation too. Both parents noted that Dylan was now doing better and was adjusting to his new circumstances.

The court-ordered custody evaluation resulted in a recommendation that the Lemckes share legal custody of Dylan and that Michael Lemcke receive sole physical custody. The evaluator based her recommendation on a finding that although both parents loved Dylan and were capable of providing the care he needed, Michael Lemcke had a uniquely intimate bond with the child and appeared to be more settled and more focused on Dylan's need for stability. The evaluator found that Dylan would be negatively affected if the bond with his father were disrupted. In arriving at her recommendation, she relied on interviews with both parents and on outside references. The father's 13 references were positive. Of the mother's five references, two were positive, two opted not to fill out the evaluator's questionnaire, and one noted that Michael Lemcke was better suited to be Dylan's primary caregiver. Because of Dylan's young age, the evaluator did not consider his wish to continue living with his father.

A psychologist Dayna Lemcke hired to evaluate Dylan concluded that Dylan loved both parents and was equally bonded to them. He also concluded that both parents loved Dylan and were likely to do whatever was necessary to encourage each other's relationship with him. In response

to Dayna Lemcke's claim that Dylan did not seem happy to see her when his father was around, the psychologist offered a number of plausible explanations, none of which included the father's alleged efforts to alienate Dylan's affection for his mother. He suggested, for example, that Dylan might be unhappy about having to end an enjoyable activity because of the custody exchange. Michael Lemcke did not participate in the evaluation because he was not told about it.

After weighing the evidence in light of the relevant statutory factors, the district court placed sole physical custody with Michael Lemcke. The court premised its decision primarily on a finding that Dylan had a uniquely close emotional relationship with his father and that upsetting that relationship would be detrimental to him. The court also found that although Michael Lemcke had initially tried to alienate Dylan's affection from his mother and her family, he now appeared able to put aside his anger and encourage a positive relationship between Dylan and his mother.

Dayna Lemcke moved for amended or more particularized findings and, alternatively, for a new trial. The court amended its findings, but it denied Dayna Lemcke's new-trial motion. In its amended findings, the court clarified that in finding that Dylan was more bonded with his father, it had relied on the custody evaluator's testimony, which was corroborated by Dylan's godmother and his daycare provider. Both testified that Dylan and Michael Lemcke shared a positive bond and that Dylan would be more comfortable with his father. The court also noted that its finding that Michael Lemcke was now able to encourage a healthy relationship between Dylan and his mother was based on Michael Lemcke's behavior, his recognition that any interference with Dylan's relationship with his mother would negatively impact Dylan, and his willingness to share custody during the pendency of these proceedings.

This appeal followed the court's amended findings and its denial of Dayna Lemcke's new-trial motion.

## ISSUE

Does the district court's finding that Michael Lemcke initially attempted to alienate Dylan's affection from his mother and her extended family preclude Michael Lemcke's sole physical custody of Dylan as a matter of law?

## ANALYSIS

 The district court has broad discretion in determining custody. *Rutten v. Rutten,* 347 N.W.2d 47, 50 (Minn.1984). When reviewing custody decisions, this court's role is limited to determining whether the district court abused its discretion by making findings unsupported by the evidence or by improperly applying the law. *Pikula v. Pikula,* 374 N.W.2d 705, 710 (Minn.1985).

 In light of the district court's finding that Michael Lemcke initially attempted to alienate Dylan's affection from his mother, Dayna Lemcke argues the district court abused its discretion as a matter of law by placing sole physical custody with Michael Lemcke based on the strength of the father-child bond. More specifically, she argues that because the father-child bond is the product of Michael Lemcke's efforts to alienate Dylan from her, the court abused its discretion in premising its custody decision on that bond. Whether a finding of alienation of affection precludes custodial placement with the offending parent as a matter of law is a question of first impression in Minnesota.

A majority of courts, including Minnesota courts, agrees that a sustained course of conduct by one parent designed to diminish a child's relationship with the other parent is unacceptable and may be grounds for denying or modifying custody.

*See, e.g., Henrikson v. Henrikson,* 288 Minn. 532, 532–33, 179 N.W.2d 284, 285 (1970) (course of conduct including interference with visitation and designed to alienate children from father's affection justified custody modification); *Begins v. Begins,* 168 Vt. 298, 721 A.2d 469, 472 (1998) (reversal of custody determination justified when mother had been primary caretaker and evidence showed that father had encouraged sons' hostility toward mother, corroded their relationship with her, and had demonstrated no capacity to place the children's interests above his own). *See generally* Annotation, *Alienation of Child's Affections as Affecting Custody Award,* 32 A.L.R.2d 1005 (1953).

But the paramount consideration in any custody decision is the best interests of the child. Minn.Stat. § 518.17 (1998). In determining a child's best interests, Minnesota courts are statutorily required to consider a variety of factors, including "the disposition of each parent to encourage and permit frequent and continuing contact by the other parent with the child." Minn.Stat. § 518.17, subd. 1(a)(13). The legislature has expressly stated that no single factor is determinative. Minn.Stat. § 518.17, subd. 1(a) ("The court may not use one factor to the exclusion of all others.") Instead, the court must weigh all statutory factors in the balance.

■ In support of her position that a finding of alienation automatically precludes Dylan's custodial placement with Michael Lemcke as a matter of law, Dayna Lemcke first argues that because interference with the parent-child relationship justifies a change of custody under Minnesota law, it *a fortiori* precludes an initial custody placement with the offending parent. She further argues that an offending parent must not be rewarded with custody. We disagree. First, the paramount consideration in all custody decisions is the child's best interests, not the parents' con-

duct. Minn.Stat. § 518.17, subd. 1. Children are not responsible for their parents' misconduct, and their best interests should not be sacrificed merely to punish a misguided parent. *See, e.g., Nickerson v. Nickerson,* 158 Vt. 85, 605 A.2d 1331, 1334 (1992) (focus should be on children's needs rather than parents' actions). This is not to say, of course, that a child's best interests are not furthered by nurturing a healthy relationship with both parents and that a sustained course of conduct by one parent designed to undermine the child's relationship with the other parent does not cast serious doubt on the offending parent's fitness to have custody and may not, on occasion, justify a denial of custody.

■ Second, evidence of alienation of affection does not automatically justify a change of custody. Under Minnesota law, proof of unwarranted denial of or interference with established visitation rights *"may* be sufficient cause for reversal of custody." Minn.Stat. § 518.175, subd. 6(e) (1998) (emphasis added); *see also* Minn. Stat. § 518.18(c) (1998) (allowing motion to modify custody earlier than one year after date of entry of decree of dissolution containing custody provision, on finding of "persistent and willful denial or interference with visitation"). This court has also stated that "[a] denial or interference with visitation is not controlling in a custody-modification proceeding," even though it must be considered along with the factors in Minn.Stat. § 518.18 (1998). *Sharp v. Bilbro,* 614 N.W.2d 260, 263 (Minn.App. 2000).

The cases on which Dayna Lemcke relies for the proposition that evidence of alienation precludes custodial placement with the offending parent as a matter of law are distinguishable. In *Henrikson,* for example, the court modified custody on a finding that the mother's interference with the father's right to communicate and visit with his children was purposeful and de-

structive of the father-child relationship. 288 Minn. at 532–33, 179 N.W.2d at 285. But the district court made no finding, and the record contains no evidence, that Michael Lemcke deliberately interfered with Dayna Lemcke's right to visit and communicate with Dylan or that his conduct was destructive of the mother-child relationship. Similarly in *Stoll v. Stoll*, 243 Minn. 510, 68 N.W.2d 367 (1955), the court transferred custody to the father on a finding that the mother had become delusional about the father's desire to perform indecent acts with the children and had attempted to impress those thoughts on the children. 243 Minn. at 512, 515, 68 N.W.2d at 369, 371. There is no finding remotely similar in this case. Finally, in *Sharp*, the court modified custody based on evidence that the mother had falsified reports of sexual abuse and subjected the children to unnecessary sexual-abuse exams. 614 N.W.2d at 263. But, again, this record contains no similar finding or evidence to support such a finding.

The foreign cases on which Dayna Lemcke relies similarly do not support her position that in custody cases involving allegations of alienation of affection, courts may not consider the child's bond to the offending parent or the child's preference for the offending parent. In *Begins*, for example, the court recognized that the ability and disposition of each parent to foster a positive relation with the other parent is "[a] critical statutory factor guiding the court's [best-interests] determination." 721 A.2d at 471. But the court also recognized that "[o]ther statutory factors, including of course the child's relationship with the primary care provider, must be weighed in the balance, and may in certain cases be decisive." *Id.* at 471–72. And in holding that an award of custody to the father was unacceptable, the court considered not only the father's "constant poisoning" of the children's relationship with their mother and its detrimental effect on

that relationship, but also the mother's primary-caretaker role before the separation and the fact that "every other consideration rendered mother the more suitable custodian." *Id.* at 473. *Begins* does not, therefore, support the proposition that in custody matters, evidence of alienation of affection is determinative. *See also In re Marriage of Will*, 489 N.W.2d 394, 399 (Iowa 1992) (considering parent's attempt to alienate child from other parent "a significant factor" in custody determination); *Fletcher v. Fletcher*, 229 Mich.App. 19, 581 N.W.2d 11, 14 (1998) (stating court properly weighed evidence that children were more affectionate toward their mother against evidence that mother discouraged children from showing affection toward their father); *O'Connor v. O'Connor*, 146 A.D.2d 909, 536 N.Y.S.2d 903, 905 (1989) (holding children's stated preference to live with their father is "not to be considered *determinative*" when evidence supports finding that father was primarily responsible for attempting to alienate children from their mother) (emphasis added).

■ In arriving at its custody determination, the district court did not consider Dylan's stated preference and, properly, did not rely exclusively on the father-child bond, even though it considered it. *See Nehra v. Uhlar*, 43 N.Y.2d 242, 401 N.Y.S.2d 168, 372 N.E.2d 4, 7 (1977) ("The desires of young children, capable of distortive manipulation by a bitter, or perhaps even well-meaning, parent, do not always reflect the long-term best interest of the children."). Admittedly, the court found that Michael Lemcke had initially attempted to undermine Dylan's relationship with his mother. But it also found that he was able to put aside his anger toward Dayna Lemcke and do what was necessary to encourage Dylan's relationship with his mother. The testimony of the custody evaluator, the psychologist Dayna Lemcke hired, Dylan's daycare provider, and Michael Lemcke himself supports the court's finding.

■ More important, the record contains no evidence that Michael Lemcke's conduct was designed to alienate Dylan from his mother. *Cf. Henrikson*, 288 Minn. at 532–33, 179 N.W.2d at 285 (mother's interference with father's right to communicate and visit with his children was purposeful and destructive of the father-child relationship); *Stoll*, 243 Minn. at 512, 68 N.W.2d at 369 (mother was delusional about father's desire to perform indecent acts with the children and had attempted to impress those thoughts on the children). Similarly, the record contains no evidence that Michael Lemcke's initial conduct actually alienated Dylan from his mother. Both the custody evaluator and Dayna Lemcke's retained psychologist observed that Dylan interacted well with both parents and was equally bonded to them. Dylan's seeming alienation from his mother was more likely the result of the separation and the almost-inevitable ill feelings that follow it, feelings that frequently throw off balance, at least initially, the child's affection for each parent. An allegation unsupported by evidence of wrongful intent or detriment to the child should not affect custody rights. *Cf. Sharp*, 614 N.W.2d at 263 (evidence that mother falsified reports of sexual abuse and subjected the children to unnecessary sexual-abuse exams justified custody modification).

### DECISION

The district court did not abuse its discretion in providing that Michael Lemcke have sole physical custody of Dylan, notwithstanding its finding that Michael Lemcke initially attempted to alienate Dylan's affection from his mother and her extended family.

**Affirmed.**

STATE of Minnesota, Respondent,

v.

Richard James CARILLO, Appellant.

No. C5–00–595.

Court of Appeals of Minnesota.

April 3, 2001.

Mike Hatch, Attorney General, Robert A. Stanich, Assistant Attorney General, St. Paul, MN; and Lisa N. Borgen, Clay County Attorney, Moorhead, MN, (for respondent).

Melissa Sheridan, Bradford Colbert, Assistant State Public Defenders, St. Paul, MN, (for appellant).

Considered and decided by KALITOWSKI, Presiding Judge, SCHUMACHER, Judge, and STONEBURNER, Judge.

## OPINION

SCHUMACHER, Judge.

Appellant Richard James Carillo was charged with drive-by shooting, drive-by shooting committed for the benefit of a gang, and unlawful possession of a firearm. The jury found Carillo guilty on all three counts. We affirm.

## FACTS

The charges in this criminal case stem from the events occurring during the evening hours of August 23, 1999 in Romkey Park in Moorhead. Many witnesses testified at trial, including Rebekah Miller and Laura Zachariason. The testimony of Miller and Zachariason was similar in almost every respect.

Miller testified that on the date in question, she had driven her car, a silver Oldsmobile, to pick up Carillo, then Zachariason, and finally Scott Matelski. After picking up Matelski, Carillo began driving Miller's car. He drove the car to Romkey Park, where an unidentified individual or individuals directed slurs toward Carillo, calling him a "faggot" and a "bitch."

Angered, Carillo drove the car out of town. Having driven on a gravel road for a time, he pulled over and produced a hand gun. After loading the gun, Carillo and Matelski began shooting the gun at various targets. When the two had finished shooting, the group of four headed back into the city. Carillo spotted an unidentified man and spoke to him for a moment. Miller overheard parts of the conversation and testified that the two discussed "Villa Lobos." Miller also noted that Carillo showed the hand gun to the man.

Carillo then drove the car back to Romkey Park. An unidentified person in the park threw an object into Miller's car, striking Matelski. Matelski became upset and exited the vehicle. Carillo drew the hand gun, reached across Miller's face, and fired two or three times out the window into Romkey Park. Carillo then exited the vehicle and fired again, once toward Romkey Park and once toward the rear of the car where Matelski had just exited. Carillo and Matelski then got back in the car, Carillo drove away and stated, among other things, "Villa Lobos for life."

In addition to the testimony of Miller and Zachariason, the state called Robert Bodin, who had been sitting by a window in his apartment near Romkey Park at the time of the incident. Bodin testified that after hearing the shots, he instructed his wife to call the police. When the police arrived at the scene, Bodin told an officer that the shooter was one of four people, all of whom had been riding in a silver Oldsmobile. A police officer showed a photo lineup to Bodin. Bodin picked Carillo from the photo lineup, although at the time he was not absolutely sure that Carillo was the shooter.

The state presented evidence claiming that it showed that the Villa Lobos is a criminal gang and that Carillo belongs to the Villa Lobos and committed the shooting for the benefit of the gang. The state offered photographs seized from Matelski's apartment depicting Carillo and other persons exhibiting gang colors and symbolism. Lieutenant Jerome Thorsen, a deputy with the Clay County Sheriff's Department assigned to the Minnesota Gang Strike Force, testified that Carillo met many of the criteria typically used by the police to infer affiliation with a criminal gang. Thorsen testified that he is familiar with the criminal activities of the Villa Lobos gang and has arrested several of its members. He stated that members of the Villa Lobos engage in various criminal activities. Based on the information available to him, Thorsen gave his opinion that the Villa Lobos is a criminal gang.

In his defense, Carillo called several witnesses. His sister, Sylvia Carillo, his aunt, Cynthia Carillo, and two friends all testified that Carillo had not been a member of a gang for at least two years, although all but his aunt acknowledged that he had been a member of a gang prior to that time. Vanessa Van, Carillo's girlfriend, would have testified that Miller had approached Van and told her that in exchange for money Miller might be willing to change her testimony. On objection, the trial court excluded this testimony on the ground that it was hearsay.

## ISSUES

1. Did the trial court err in permitting the police officer to testify as to the criminal activities of the Villa Lobos and as to his opinion that the Villa Lobos organization constitutes a criminal gang?

2. Did the trial court err in excluding out-of-court statements which would have been used to impeach a witness for the prosecution?

3. Was the evidence sufficient to support the conviction for a violation of Minn. Stat. § 609.229, subd. 2 (1998)?

## ANALYSIS

■ 1. Carillo contends that Thorsen should not have been permitted to testify as to whether the Villa Lobos constitutes a criminal gang. Carillo contends that the state must instead introduce evidence that members of the Villa Lobos have committed various crimes and leave for the jury the determination as to whether this amounts to a criminal gang. We disagree.

■ Minn.R.Evid. 702 states as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Accordingly, the primary criterion for admissibility is whether the opinion testimony will be helpful to the trier of fact—that is, whether the testimony will assist the jury in resolving factual questions presented. *State v. Grecinger,* 569 N.W.2d 189, 195 (Minn.1997). In keeping with this approach, Minnesota appellate courts have permitted police officers to provide expert testimony concerning subjects that fall within the ambit of their expertise in law

enforcement. *See, e.g., State v. Thompson,* 300 Minn. 220, 222, 218 N.W.2d 760, 762 (1974) (police officer with on-the-job experience qualified as expert in fingerprint identification despite lack of formal training); *State v. Peterson,* 266 Minn. 77, 80, 82, 123 N.W.2d 177, 181 (1963) (experienced police officers permitted to offer opinion as to whether defendant was intoxicated); *State v. Collard,* 414 N.W.2d 733, 736 (Minn.App.1987) (narcotics police officer testified as to amount of cocaine that person is likely to possess for personal use); *State v. Schaffer,* 378 N.W.2d 115, 116 (Minn.App.1985) (police officer permitted to give expert opinion concerning accident reconstruction despite lack of certification).

■ A trial court has wide discretion in conducting a trial, including the admissibility of expert testimony. *State v. Miles,* 585 N.W.2d 368, 371 (Minn.1998). A reviewing court will not reverse the trial court's decision absent an "apparent error." *State v. Myers,* 359 N.W.2d 604, 609 (Minn.1984).

■ Here, Carillo was charged with a violation of Minn.Stat. § 609.229, subd. 2 (1998), which states:

A person who commits a crime for the benefit of, at the direction of, in association with, or motivated by involvement with a criminal gang, with the intent to promote, further, or assist in criminal conduct by gang members is guilty of a crime * * *.

The term "criminal gang" is defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal," which:

(1) has, as one of its primary activities, the commission of one or more of the offenses listed in section 609.11, subdivision 9; [1]

(2) has a common name or common identifying sign or symbol; and

---

1. The offenses included under this provision

include various degrees of murder, assault,

(3) includes members who individually or collectively engage in or have engaged in a pattern of criminal activity.

*Id.*, subd. 1 (1998). In proving a violation of Minn.Stat. § 609.229, subd. 2, the introduction of evidence of prior criminal activity of gang members to demonstrate that the association is a "criminal gang" is not only probative, but is an essential element of the state's case. *State v. Chuon*, 596 N.W.2d 267, 270 (Minn.App.1999), *review denied* (Minn. Aug. 25, 1999).

In an appeal brought by Carillo's co-defendant Matelski, this court held that the trial court properly rejected Matelski's offer to stipulate to the admitted evidence that the Villa Lobos is a criminal gang of which Matelski was a member. *State v. Matelski*, 622 N.W.2d 826, 832 (Minn.App. 2001). That evidence included expert opinion testimony from police officers in the Minnesota Gang Strike Force. *Id.* at 830.

The state correctly points out that the makeup and dynamics of a criminal gang are beyond the experience of the average lay juror, and therefore the opinion of a police officer who has experience with gangs would be helpful to the jury. That, however, is not the precise issue. Rather, the issue is whether it is helpful to the jury, in making the determination as to whether a particular group constitutes a criminal gang, to hear from an expert concerning the primary activities of that particular group or association.

Neither the Minnesota Supreme Court nor the Court of Appeals has had cause to visit this precise question.[2] Those juris-

dictions that have addressed the issue, however, have held that, upon establishing proper foundation and meeting the helpfulness requirement, a police officer may offer an expert opinion as to whether a group or association constitutes a criminal gang. *See People v. Gardeley*, 14 Cal.4th 605, 59 Cal.Rptr.2d 356, 927 P.2d 713, 722 (1996) (holding that expert testimony by police officer based on conversations with defendants, Family Crip members, personal investigations of crimes committed by gang members, and information from colleagues and law enforcement organizations was admissible and gave jury sufficient grounds to find that group constituted a "criminal street gang" defined as (1) an ongoing organization of three or more persons (2) that shares a common name or identifying symbol (3) and has as one of its primary activities the commission of one or more enumerated crimes); *State v. Lewis*, 514 N.W.2d 63, 68 (Iowa 1994) (holding that testimony of police officer as to whether Vice Lords was criminal street gang, having crime as one of its primary activities, was both relevant and admissible as to whether Vice Lords had crime as one of the primary activities of organization). We find these decisions persuasive and not inconsistent with existing Minnesota law.

■■ Because we have afforded substantial discretion to trial courts in permitting expert testimony of police officers testifying about matters within the ambit of their law enforcement expertise, we hold that a trial court does not abuse its discretion in permitting a police officer to offer an expert opinion as to whether a particular group constitutes a criminal gang. As

---

burglary, kidnapping, false imprisonment, manslaughter, robbery, witness tampering, criminal sexual conduct, escape from custody, arson, drive-by shooting, harassment and stalking, possession or unlawful use of a firearm, felony violation of chapter 152, and any attempt thereof. Minn.Stat. § 609.11, subd. 9 (1998).