*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0680**

State of Minnesota,
Respondent,

vs.

Edward Antonio Zappa,
Appellant

**Filed February 21, 2017
Affirmed
Worke, Judge**

Hennepin County District Court
File No. 27-CR-15-27249

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Elizabeth R. Johnston, Assistant County
Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jenna Yauch-Erickson, Assistant
Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Halbrooks, Presiding Judge; Worke, Judge; and Jesson,

Judge.

**U N P U B L I S H E D   O P I N I O N**

**WORKE**, Judge

        Appellant challenges his domestic-assault conviction, arguing that the district court

abused its discretion by admitting a 911 call under the excited-utterance exception to the

hearsay rule and violated his rights under the Confrontation Clause by allowing two police officers to testify to the victim's statement that he assaulted her. We affirm.

## FACTS

At approximately 8:00 p.m. on September 17, 2015, O.E. pounded on J.J.'s door. O.E. and her boyfriend, appellant Edward Antonio Zappa, lived near J.J. in the same mobile home complex. O.E. said that she had been in a fight with Zappa and asked J.J. to call the police. J.J. noticed blood on O.E.'s lip. O.E. was crying and talking very quickly. J.J. called 911 and said, among other things, "I am the neighbor over here, and the girlfriend just ran over here saying that her boyfriend beat the sh-t out of her." O.E. briefly got on the phone and identified Zappa as her boyfriend. Within five or ten minutes of O.E. knocking on J.J.'s door, police were on the scene.

Seconds prior to J.J.'s call, B.W. called 911. B.W. made the call from a condominium building next to the mobile home complex. He told the 911 operator to send police "quick." He was so insistent that police be sent immediately that at one point the 911 operator had to ask him to refocus, saying, "Sir, answer my question, okay. There is a reason I am asking. It's not to annoy you." He said that he could see and hear "[a] guy beating the living hell out of a woman." He described the male as wearing a blue shirt and jeans and the woman as wearing a white shirt. He said he heard the woman screaming "help me" and "quit hitting me." He also said that he heard children saying "stop hitting mommy."

Zappa's mother also lived in the mobile home complex. That night around 8:00 p.m., she heard a woman yelling. She went outside to investigate and saw Zappa, who said

2

that he and O.E. had been yelling at each other and then asked her to check on O.E. Zappa told his mother that he was going for a walk, and she did not see him again that night.

When police arrived, they spoke with O.E. She was crying and screaming. She had a bloody lip, blood on her face, a swollen eye, and scratches around her neck. O.E. told officers that her boyfriend had assaulted her. At this point, police had not apprehended Zappa and did not know his whereabouts. O.E. said that Zappa walked away and headed east with another male. Police searched unsuccessfully for Zappa in his mobile home and in his mother's mobile home. They also gave O.E. information on a domestic-violence center. O.E. was taken to the hospital. Police alerted other officers in the area that they were looking for Zappa, but it was several weeks before he was located and arrested.

Zappa was charged with one count of felony domestic assault.[1] Neither B.W. nor O.E. testified at Zappa's jury trial. The state began its case-in-chief by playing the recording of B.W.'s 911 call. Zappa objected to the call. The district court admitted the call as an excited utterance.

O.E.'s statement to police that Zappa had assaulted her was admitted through the testimony of two police officers. Zappa objected to the officers' testimony on the grounds that it violated his rights under the Confrontation Clause. The district court overruled the objections, determining that O.E.'s statement was not testimonial because the officers questioned O.E. in order to respond to an ongoing emergency.

---

[1] Zappa was also charged with one count of domestic assault by strangulation. This count, however, was dismissed by the state on the first day of trial.

3

Zappa testified in his own defense. He claimed that he and O.E. had agreed to stop using heroin and were suffering from withdrawal symptoms on September 17, 2015. O.E. left their home that evening and came back with heroin. Zappa confronted O.E. and told her that they had to get clean. He tried to take a syringe full of heroin from O.E. They struggled over it and both fell to the floor. Zappa pulled the syringe away from O.E. O.E. started hitting herself and saying that if he did not give it back she was going to call the police. Zappa ran outside and discharged the heroin from the syringe onto the ground.

The jury found Zappa guilty of felony domestic assault. This appeal followed.

## D E C I S I O N

### B.W.'s 911 call

Zappa first argues that the district court abused its discretion by admitting B.W.'s 911 call as an excited utterance. He claims that the exception does not apply because B.W. was not sufficiently excited at the time that he made the statement and because the statement is not trustworthy.

Generally, hearsay is inadmissible at trial unless an exception applies. Minn. R. Evid. 802. The excited-utterance exception allows for the admission of hearsay if it "relat[es] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Minn. R. Evid. 803(2). "The rationale [for this exception] stems from the belief that the excitement caused by the event eliminates the possibility of conscious fabrication, and insures the trustworthiness of the statement." *State v. Daniels*, 380 N.W.2d 777, 782 (Minn. 1986) (quotation omitted). "While there are no strict temporal guidelines for admitting an excited utterance, the statement must be made

4

while the declarant is under the stress of excitement from the startling event." *State v. Davis*, 820 N.W.2d 525, 536 (Minn. 2012) (quotation omitted). The factors used to determine if a "statement qualifies as an excited utterance include the length of time elapsed, the nature of the event, the physical condition of the declarant, and any possible motive to falsify." *State v. Hogetvedt*, 623 N.W.2d 909, 913 (Minn. App. 2001) (quotation omitted), *review denied* (Minn. May 29, 2001). Evidentiary rulings are left to the district court's discretion, and we will only reverse for a clear abuse of that discretion. *Davis*, 820 N.W.2d at 536.

Zappa first argues that B.W. was not sufficiently excited at the time of the 911 call for the statement to qualify as an excited utterance. The fact that the declarant is upset or agitated indicates that the individual is still experiencing the stress caused by the startling event. *See State v. Bauer*, 598 N.W.2d 352, 366 (Minn. 1999) (admitting statement as excited utterance because declarant was "very upset," "extremely agitated," and "very afraid"). While B.W.'s voice was not raised during the 911 call and he was not speaking particularly quickly, he does appear to have been excited or agitated by the assault he witnessed. He insisted that police be sent immediately and used strong language, saying, "A guy is beating the living hell out of a woman." Because of his agitation and insistence that the operator send police to the scene, he, at times, failed to respond to the 911 operator's questions. The operator felt the need to forcefully interrupt him and say, "Sir, answer my question, okay. There is a reason I am asking. It's not to annoy you." The fact that B.W., a bystander, felt the need to call 911 and insist on immediate police assistance indicates that he was excited by the event.

Other factors also indicate that B.W.'s 911 call is admissible as an excited utterance. *See Hogetvedt*, 623 N.W.2d at 913 (listing factors that should be considered). First, the call occurred immediately following the assault and while B.W. could still see the participants in the assault. At least initially, B.W. actually used the present tense to describe the assault. B.W. called 911 at 8:16 p.m., seconds before J.J. called 911. J.J. testified that O.E. knocked on his door around 8:00 p.m. that night, and Zappa's mother similarly testified that she heard yelling at about 8:00 p.m.

Second, an assault qualifies as a "startling event" for the purposes of the excited-utterance exception. *Id*. Nevertheless, Zappa claims that because B.W. was a bystander, not the victim, and was not in close proximity to the assault, he was unlikely to fall within the "aura of excitement" of the startling event. *See* Minn. R. Evid. 803(2) 1989 comm. cmt. The supreme court, however, has stated that the mere fact that the declarant is a bystander does not render the statement inadmissible. *Daniels*, 380 N.W.2d at 783.

Third, B.W. had no reason to fabricate his statement. He did not know Zappa and had no apparent relationship to O.E. Despite this, Zappa claims that B.W.'s statement is untrustworthy. He argues that B.W. may not have seen the assault at all because the assault occurred inside his home. But the evidence does not clearly indicate that the assault occurred solely inside the home. Although Zappa testified that the assault took place inside, no other testifying witness actually saw the assault. And a police officer testified that "the uninvolved witnesses observed [the assault] occurring outside."

Zappa also points to other problems with B.W.'s statement. B.W. said that O.E. was wearing a white shirt. Photographs of O.E. taken that night show her wearing a blue

shirt. B.W. also said that he heard a child say "stop hitting mommy." O.E. does not have any children. Zappa also argues that B.W.'s view may have been obscured by trees, darkness, and distance. While these are all valid points, they go to weight, not admissibility. The defense argued these issues at trial, and it was for the jury to decide whether to credit B.W.'s statement. *See State v. Buckingham*, 772 N.W.2d 64, 71 (Minn. 2009) ("[D]etermining the credibility or reliability of a witness lies with the jury alone."). Zappa cites no authority indicating that an otherwise admissible excited utterance must be excluded if there are some questions about its accuracy.

Moreover, the trustworthiness of B.W.'s 911 call is supported by other evidence. J.J.'s testimony and his 911 call, Zappa's mother's testimony, and even Zappa's own testimony, all indicate that some sort of struggle went on between Zappa and O.E. immediately before B.W. called 911.

B.W. was excited during the 911 call, he made the call immediately after witnessing a startling event, and he had no reason to fabricate his statement. The district court did not abuse its discretion by admitting B.W.'s 911 call as an excited utterance.

***Police officers' testimony about victim's on-scene statement***

Zappa next argues that the district court erred by allowing two police officers to testify that O.E. said that Zappa assaulted her. Zappa argues that O.E.'s statement was testimonial and that its admission violated his rights under the Confrontation Clause. Whether the admission of evidence violated the defendant's rights under the Confrontation Clause is a question of law that this court reviews de novo. *Hawes v. State*, 826 N.W.2d 775, 786 (Minn. 2013).

7

The Confrontation Clause of the United States Constitution provides a criminal defendant with the right "to be confronted with the witnesses against him." U.S. Const. amend. VI; *see also* Minn. Const. art. I, § 6; *State v. Hull*, 788 N.W.2d 91, 100 (Minn. 2010) (stating that the analysis of a Confrontation Clause claim is the same whether it is brought under the federal or Minnesota constitution). The Confrontation Clause prohibits the admission of testimonial out-of-court statements unless the declarant is unavailable to testify and the defendant had a previous opportunity to cross-examine the declarant. *Andersen v. State*, 830 N.W.2d 1, 9 (Minn. 2013) (citing *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004)).

Whether a statement to police is testimonial depends on the primary purpose of police questioning:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the *primary purpose* of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the *primary purpose* of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

*State v. Wright*, 726 N.W.2d 464, 472 (Minn. 2007) (quoting *Davis v. Washington* (*Davis/Hammon*), 547 U.S. 813, 822, 126 S. Ct. 2266, 2273-74 (2006)). In order to be nontestimonial, "the interrogation must relate directly to addressing the emergency." *State v. Warsame*, 735 N.W.2d 684, 694 (Minn. 2007). It is the state's burden to prove that a statement is not testimonial. *Andersen*, 830 N.W.2d at 9.

Zappa argues that when O.E. spoke with police, there was no ongoing emergency because the assault had ended, police were with O.E., and Zappa had left the scene. He cites *Davis/Hammon* as support for his position. In that opinion, the Supreme Court addressed two separate cases that both involved domestic violence. *Davis/Hammon*, 547 U.S. at 813, 126 S. Ct. at 2268. In *Davis*, the victim described an assault in a 911 call as the assault was occurring. *Id.* at 817-18, 126 S. Ct. at 2271. The Supreme Court held that this statement was not testimonial. *Id.* at 828, 126 S. Ct. at 2277.

In *Hammon*, police responded to a call about a domestic disturbance and found a woman standing on her porch. *Id.* at 819, 126 S. Ct. at 2272. The woman looked frightened but told police that "nothing was the matter." *Id.* Police entered the house and saw the woman's husband. *Id.* He told the officers that the couple had an argument but that everything was "fine." *Id.* One officer stayed with the husband while the other interviewed the woman. *Id.* After hearing the woman's account, the officer had her write down what happened and sign an affidavit. *Id.* at 820, 126 S. Ct. at 2272. The woman's written statement described how her husband assaulted her. *Id.* The Supreme Court held that there was no ongoing emergency and that the interrogation of the woman was an investigation into past criminal conduct. *Id.* at 829, 126 S. Ct. at 2278.

Zappa argues that O.E.'s statement resembles *Hammon*. But in *Hammon*, the declarant initially told the officers that "nothing was the matter." *Id.* at 819, 126 S. Ct. at 2272. Also, in that case, the defendant and the declarant were both with police when the declarant made her statement. *Id.* At the time O.E. was interviewed by police, she was visibly injured, crying, and Zappa's whereabouts were unknown. As the Supreme Court

9

recognized in *Davis/Hammon*, in this type of domestic-violence context, officers "need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim." *Id.* at 832, 126 S. Ct. at 2279 (quotation omitted). This often means that initial police inquiries "produce nontestimonial statements." *Id.*

Contrary to Zappa's contention, the mere fact that the victim is with police and the assailant is not in the immediate area does not mean that there is no ongoing emergency. In *Warsame*, the Minnesota Supreme Court stated that "ongoing emergencies may exist beyond the declarant's geographic proximity, even when police are with the declarant and particularly when a dangerous suspect remains at large." 735 N.W.2d at 694. In that case, while responding to a 911 call, police found a woman walking in the middle of the street. *Id.* at 687. The woman was upset, crying, and had injuries to her head. *Id.* Before police asked any questions, she said, "My boyfriend just beat me up." *Id.* The officer treated the woman's injuries and asked her what happened. *Id.* The woman said that her boyfriend hit her and choked her and that when her sisters tried to intervene, the boyfriend grabbed a knife and threatened to kill her. *Id.* The woman also said that her boyfriend had left in a vehicle with one of her sisters. *Id.* The supreme court held that the woman's statements were not testimonial because the primary purpose of the interrogation was to address three ongoing emergencies: the woman's medical condition, the defendant's flight from the scene, and an injury to one of the woman's sisters. *Id.* at 695.

In *Michigan v. Bryant*, police responded to a report of a shooting. 562 U.S. 344, 349, 131 S. Ct. 1143, 1150 (2011). They found the victim lying on the ground with a

10

gunshot wound. *Id.* The police asked him "what had happened, who had shot him, and where the shooting had occurred." *Id.* In a five-to-ten-minute conversation, the victim gave police the assailant's name and told them when, where, and how he had been shot. *Id.* The victim was then taken to the hospital where he died within hours. *Id.* The Supreme Court determined that the informality of the interrogation and the potential threat the at-large assailant posed to the victim, the police, and the general public objectively indicated that the "primary purpose of the interrogation was to enable police assistance to meet an ongoing emergency." *Id.* at 375-78, 131 S. Ct. at 1165-67 (quotation omitted).

Here, police spoke with O.E. within minutes of the assault. O.E. was crying, hysterical, and had visible injuries. At the time, Zappa was not in custody and police were not aware of his location. In a short conversation, O.E. explained that Zappa had assaulted her and fled on foot. The officer who questioned O.E. testified that he was trying to determine what happened so that he could locate Zappa. He also testified that he believed that O.E. was in need of medical attention. After speaking with O.E., police checked to see if Zappa was hiding in his mobile home or in his mother's mobile home and put an alert out to other officers in the area. Police also provided O.E. with information on a domestic-violence center and had O.E. taken to the hospital.

As in *Warsame* and *Bryant*, the circumstances of the interrogation objectively indicate that its primary purpose was to assess O.E.'s injuries and locate Zappa, rather than to prove past events that might be relevant to later prosecution. The interrogation was directly related to the ongoing emergencies because it led to information about how O.E. received her injuries and about Zappa's possible whereabouts. Because O.E.'s statement

11

was not testimonial, the district court did not violate Zappa's right to confrontation by admitting the statement through the officers' testimony.

**Affirmed.**