## Andrew Thomas HAWES, petitioner, Appellant,

v.

## STATE of Minnesota, Respondent.

Nos. A10–1351, A12–0212.

Supreme Court of Minnesota.

Feb. 27, 2013.

David W. Merchant, Chief Appellate Public Defender, Davi E. Axelson, Assistant State Public Defender, St. Paul, MN, for appellant.

Lori Swanson, Attorney General, St. Paul, MN; and Anthony C. Palumbo, Anoka County Attorney, Kathryn M. Timm, Assistant County Attorney, Anoka, MN, for respondent.

## OPINION

PAGE, Justice.

Appellant Andrew Hawes (Hawes) was found guilty after a jury trial and subsequently convicted of aiding and abetting the first-degree premeditated murder of his brother, Edwin Hawes, in violation of Minn.Stat. §§ 609.185(a)(1) and 609.05, subd. 1 (2012), as well as obstructing an investigation in violation of Minn.Stat. § 609.495, subd. 3 (2012). As a result of these convictions, Hawes was sentenced to life in prison without the possibility of parole. We granted Hawes' motion to stay his direct appeal so that he could pursue a petition for postconviction relief. The postconviction court denied Hawes' petition. In this appeal, which consolidates Hawes' direct appeal and his appeal from the denial of postconviction relief, Hawes raises two issues: (1) whether the postconviction court erred in denying his claim of ineffective assistance of trial counsel; and (2) whether the trial court violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution by admitting certain out-of-court statements made by his sister and his girlfriend to police. Because we conclude that there is no reasonable probability that, but for counsels' alleged errors, the outcome of the trial would have been different, and that any error with respect to Hawes' Confrontation Clause claim was harmless beyond a reasonable doubt, we affirm.

Edwin Hawes disappeared on October 29, 2008; his burned remains were found by police approximately two days later in a fire pit on farm property owned by Hawes near Westbrook, Minnesota. At trial, the State's theory was that Hawes, along with his sister Elizabeth Hawes, his girlfriend Kristina Dorniden, and his brother-in-law Daniel Romig, participated in a plan to kill Edwin and cover up his death. Hawes contended that, while he participated in the events leading to Edwin's death, Edwin's death resulted from a car repossession gone awry and was not premeditated.

The State presented the following evidence at trial. At some point before his murder, Edwin moved into the home of Martin Weltman in Andover, Minnesota. He did so at the suggestion of Weltman and Weltman's daughter, Ursula, who was concerned for Edwin's safety. Ursula was aware that Edwin and Hawes were in a feud about the family business, Hawes Lawn Service, had seen notes that Hawes had left in the office threatening Edwin's life, and believed that Edwin was in a very dangerous situation. At some point, Edwin began carrying a gun because of various incidents with Hawes and Elizabeth Hawes. Edwin eventually left the family business.

Elsa Marshall testified about an incident she observed on July 19, 2008, while driving on Chicago Avenue in south Minneapolis. The incident involved a white pickup truck revving its engine and bumping the car in front of it, eventually spinning

the car around facing the opposite direction. The car was occupied by an adult male driver and a little girl. Officer Floyd Buras of the Minneapolis Police Department testified that he responded to a disturbance call regarding this incident. The car involved was a Volkswagen Passat being driven by Edwin. Edwin's young daughter was a passenger in the car. Officer Buras testified that Edwin told him: (1) "he was rear ended ... by a white pickup truck," (2) he "observed that [the driver of the pickup] was his brother," and (3) that "he thought that his brother was going to hurt him."

In the early morning hours of October 30, 2008, Deputies Brian Pierson and Brett Froslee were in the parking lot of the Woodland Creek Golf Course, which is approximately one mile from Weltman's house, when Elizabeth Hawes walked into the lot and told the deputies that she was having problems with a Hawes Lawn Service truck parked in the lot. When asked why she was in the area, Elizabeth told the deputies that she was working on a cancer benefit for a friend. Because her "story wasn't making sense," the officers conducted a record search on Elizabeth and eventually learned that there was a restraining order prohibiting Elizabeth from being in the vicinity of Edwin's house. One of the deputies attempted to contact Edwin by going to Weltman's house. On his way, the deputy was flagged down by Hawes, who was walking in the street. Hawes told the deputy that he was having a diabetic reaction. The deputy called an ambulance and drove Hawes back to the parking lot. Hawes told the officers that he was in the neighborhood to repossess a car from his brother. At some point, Elizabeth admitted to being in the area for the same purpose. Elizabeth was subsequently arrested for violation of the restraining order. Hawes eventually left the scene in the Hawes Lawn Service truck.

Later that morning, Deputy Josh Hatton saw a wallet on the road as he drove past Weltman's house. Deputy Hatton found Edwin's driver's license in the wallet. He spoke to Weltman, who explained that Edwin lived at the house, but was not home. As Deputy Hatton was leaving, he noticed a pool of blood on the driveway. Because it was the start of bow hunting season, he assumed the blood came from a deer.

Early that afternoon, Deputy Jonathan Essig was dispatched to Weltman's house due to a report of a suspicious pool of blood. When Essig arrived, he saw a large pool of coagulated blood on the driveway. While speaking with Weltman and Weltman's daughter, Essig also noticed blood smears on the home and smaller pools of blood along the sidewalk and in the landscaping chips.

Jon Berggren of the Anoka County Crime Lab arrived at Weltman's house later that afternoon. Berggren observed a large pool of blood on the driveway in addition to various blood spatters, drops, and wall stains near the driveway area. It appeared to him as though something had been dragged from the landscaping chips onto the adjacent driveway and that someone had tried to clean up the scene with a liquid. Further investigation revealed the tip of a hunting arrow on the driveway, a cellular phone case with blood on it, a cellular phone battery, a broken arrow, and a bottle of bleach in the yard. A more thorough search of Weltman's yard uncovered a baseball bat near the side of the home that had been spray painted black, two small maul-type hammers in separate locations, and a can of spray paint. Weltman testified that he did not own the bat or hammers found near the house. Various pieces of evidence were also found near the parking lot of the Woodland

Creek Golf Course, including a crossbow, a quiver containing a single arrow, a separate single arrow, a plastic jug smelling of bleach, a brown jacket, and two blood-stained latex gloves.

Around 11:20 p.m. on October 30, Westbrook police chief Alan Wahl received a phone call from the Anoka County Sheriff's Office asking if Wahl would try to locate Hawes. Wahl drove to Hawes' farm where he found Hawes and saw the glow of a bonfire burning in the distance. He spoke with Hawes and, among other things, Wahl asked Hawes whether Hawes had a permit for the fire. Wahl's conversation with Hawes took place some distance away from the fire and Wahl did not have occasion to look directly into the fire. Hawes appeared "unsettled, nervous, edgy, fidgety."

Wahl then left the farm and returned with a state trooper and a sheriff's deputy shortly after midnight. When they arrived, Elizabeth Hawes was standing near the fire. The officers noticed traces of blood around the fire and found what appeared to be a body in the fire. At around 2 a.m., Kristina Dorniden returned to the farm in Daniel Romig's pickup. Blood was seen running out of the pickup's tailgate. Around 7 a.m. on October 31, Hawes was arrested at Dorniden's parents' home in Westbrook.

On October 31, Berggren was dispatched to a church parking lot in Golden Valley where Edwin's Volkswagen Passat had been found. Blood was discovered on the rocker panel, the right headlight, the front passenger door, the left rear bumper, the left rear quarter panel, the bottom of the rear driver's door, and the bottom of the car. Hair and blood were found on the left front wheel. There was a three- or four-pound hammer that was "brand new and covered with blood" in the trunk.

There was also a loaded pistol in a case on the floor of the back seat.

A search of Romig's pickup truck uncovered two plastic jugs containing a liquid that smelled like bleach, as well as three latex gloves in the truck bed that had traces of blood. In addition, there was a bloody tennis shoe with a portion of an arrow sticking out of it and a stream of blood that ran the length of the truck bed. A search of the Hawes Lawn Service office uncovered traces of blood, but investigators were not able to determine the source of the blood or how long it had been there. During a search of Hawes' home, the police found latex gloves that appeared to have deposits of spray paint on them and white paper that appeared to serve as a backdrop for spray painting in an area of the garage.

Detective Patrick O'Hara testified about phone records involving two prepaid cellular phones, Elizabeth Hawes' home phone, as well as the cellular phones of Hawes, Elizabeth Hawes, Kristina Dorniden, and Daniel Romig. The prepaid phones were purchased at a convenience store near Hawes' home. The records indicate that on October 29, there were a number of calls made between one of the prepaid phones and phone numbers associated with Hawes and Elizabeth Hawes. Records also indicated that at approximately 5 p.m. on October 29, 2008, Hawes' cell phone was in close proximity to a gym where Edwin was present.

Dr. Jason Simser testified as to the DNA testing results of various latex gloves found in Weltman's yard. On one set of gloves, the exterior blood samples matched Edwin's DNA and samples inside the gloves matched Elizabeth Hawes' DNA. On the other pair, the blood on the outside of the gloves matched Edwin's DNA and the blood on the inside of the gloves matched Hawes' DNA. Blood on the ham-

mer found in the trunk of the Passat and on Hawes' and Elizabeth Hawes' shoes also matched Edwin's DNA.

Edwin's body had multiple direct impact injuries that were inflicted before his body was placed in the fire. His left eye orbit was fractured on all sides, his upper jaw was horizontally fractured where it met his teeth, the part of his body connecting his spinal cord to his brain was crushed, there was a wedge-shaped fracture to his right humerus caused by a significant amount of force, and there were multiple fractures to Edwin's ribs and pelvic area.

Dr. Janis Amatuzio, who performed the autopsy on Edwin's remains, concluded that Edwin had suffered bleeding in the brain that was caused by his head striking something and noted injuries to Edwin's chest that were consistent with his chest having been pierced by a broad head arrow, which had passed from the back of Edwin's body to the front. She concluded that Edwin's death was "due to homicidal violence."

After the State presented its evidence, Hawes testified about the events surrounding Edwin's murder. In 2005, Hawes developed thyroid problems and was diagnosed with diabetes. As a result, Hawes left Hawes Lawn Service for a year and a half before returning in 2007. When he returned, he came to believe that Edwin had been embezzling money from the business. Edwin became aware of the allegations and subsequently left the business. However, Edwin continued to drive a Volkswagen Passat, which was owned and insured by Hawes Lawn Service. In an effort to recover the Passat, Hawes tried multiple strategies, including contacting the Golden Valley Police Department, which he alleges advised him to confront Edwin and take the car.

Eventually, Hawes developed a plan to retrieve the Passat from Edwin. The plan included the use of untraceable, prepaid cell phones. Because Hawes was aware that Edwin carried a gun with him at all times, the plan also included having Romig bring a crossbow so that Hawes could disarm Edwin.

Hawes testified that he carried out the plan on October 29, 2008. Hawes drove with Dorniden to Weltman's house. When they arrived, Hawes got out of the car and Dorniden drove away. Romig arrived soon thereafter with the crossbow. Hawes and Romig then waited until Edwin arrived home in the Passat and parked in front of the garage. According to Hawes, upon arriving home, instead of walking toward the front door of the house, Edwin walked toward a garbage can where Romig was hiding. Edwin looked like he was reaching for Romig and then stumbled backwards screaming, "Oh my God, Oh my God." Although he did not see or hear the crossbow being fired before Edwin began stumbling backwards, Hawes did see Romig punch Edwin in the head, bounce Edwin against the house, and roll around fighting with Edwin. While this was going on, Hawes got into the driver's seat of the Passat. At some point, Romig opened the trunk and asked Hawes to help him put Edwin's body inside. Hawes refused, drove the Passat forward a few feet, then put it in reverse and "took off." Hawes felt and heard a few "thump[s]" as he backed up. While he did not know as it was happening, he later realized that he had run over Edwin. Hawes subsequently saw Romig throw Edwin over his shoulder and run into the woods. Hawes left the scene and drove to the Hawes Lawn Service office where he met Romig. From there, the two abandoned the Passat and eventually drove to Romig's house. Hawes and Elizabeth Hawes then drove a Hawes Lawn Service truck back to Edwin's neighborhood to retrieve the cross-

bow and attempt to clean the scene. To clean the scene, they brought bottles of bleach and latex gloves with them. They parked the truck at the Woodland Creek Golf Course, which was approximately one mile from Weltman's house. Hawes walked to the house, attempted to clean the blood with bleach, retrieved the crossbow and arrows, and began walking back to the truck when he saw police cars. After seeing the police cars, he threw the bottles of bleach and the crossbow into the woods and continued walking to the parking lot. He began feeling symptoms of low blood sugar and flagged down one of the police cars as it approached. An ambulance was called and once paramedics stabilized Hawes, he drove back to Minneapolis.

The following day, Hawes, Elizabeth Hawes, and Dorniden drove Romig's pickup truck, with Edwin's body in the bed, to the farm property Hawes owned near Westbrook, Minnesota. When they arrived, Hawes started a fire and put Edwin's body into the fire.

Hawes' first claim is that his trial attorneys were ineffective when they failed to object on hearsay and Confrontation Clause grounds to the testimony of Officer Buras regarding the incident in which Hawes allegedly rammed the Passat with a Hawes Lawn Service truck. Before trial, the State filed a motion in limine pursuant to Minn.Stat. § 634.20 (2012) to "admit the Assault in the Second Degree incident" stemming from the ramming incident. The State also filed a *Spreigl* notice. *See generally State v. Spreigl*, 272 Minn. 488, 496–97, 139 N.W.2d 167, 172–73 (1965) (requiring that a defendant receive written notice of the additional crimes or misconduct that the prosecution seeks to prove at trial). Hawes' attorneys objected to the admission of that evidence, arguing that it was cumulative and that any probative value was outweighed by the risk of unfair prejudice. Hawes' attorneys did not object on either hearsay or Confrontation Clause grounds. The trial court granted the State's motion to admit the relationship evidence. At trial, Officer Buras was allowed to testify about Edwin's out-of-court statements that it was Hawes who was driving the truck that rammed the Passat and that Edwin thought Hawes was going to hurt him.

Following his trial, Hawes filed a petition for postconviction relief asserting that his trial attorneys were ineffective for not objecting to Officer Buras's testimony on hearsay and Confrontation Clause grounds. After an evidentiary hearing, the postconviction court denied relief on the ground that Hawes did not satisfy his burden of showing that, but for the error, the outcome of the trial would have been different. On appeal, Hawes argues that because Officer Buras's testimony was "the strongest evidence of Andrew Hawes' premeditation to kill his brother," there is a reasonable probability that the outcome of the trial would have been different had his attorneys objected to that testimony on hearsay and Confrontation Clause grounds.

We review the denial of postconviction relief based on a claim of ineffective assistance of counsel de novo because such a claim involves a mixed question of law and fact. *See Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Rhodes*, 657 N.W.2d 823, 842 (Minn.2003). To establish ineffective assistance of counsel, the petitioner must show both that: (1) his trial attorneys' performance fell below an objective standard of reasonableness; and (2) a reasonable probability exists that, but for his attorneys' errors, the outcome of the trial would have been different. *Williams v. State*, 764 N.W.2d 21, 29–30 (Minn.2009)

(citing *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052). We need not address both prongs if one is determinative. *Rhodes*, 657 N.W.2d at 842 (citing *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052). In considering the second prong of the *Strickland* test, a "reviewing court considers the totality of the evidence before the judge or jury." *Id.* Having found that Hawes failed to establish that there is a reasonable probability that, but for counsel's errors, the outcome of the trial would have been different, the postconviction court did not address the first prong of the test.

 As noted, Hawes contends that Edwin's unconfronted out-of-court statements were the strongest evidence of premeditation admitted at trial. Premeditation "means to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn. Stat. § 609.18 (2012). The existence of premeditation is generally "inferred from the totality of the circumstances surrounding the crime." *State v. Buchanan*, 431 N.W.2d 542, 547 (Minn.1988) (citing *State v. Wahlberg*, 296 N.W.2d 408, 415 (Minn. 1980)). When evaluating premeditation, we consider evidence of planning activity, motive, and the nature of the killing. *State v. Hughes*, 749 N.W.2d 307, 313 (Minn.2008); *see also State v. Holliday*, 745 N.W.2d 556, 563 (Minn.2008).

In its order denying relief, the postconviction court summarized the evidence of Hawes' premeditation on which it relied in concluding that Hawes failed to satisfy the second prong of the *Strickland* test. The court described in detail the evidence presented to the jury of planning activity, which we have defined as " 'facts about how and what the defendant did [before] the actual killing which show he was engaged in activity directed toward the killing....' " *State v. Moua*, 678 N.W.2d 29, 40 (Minn.2004) (quoting *State v. Moore*, 481 N.W.2d 355, 361 (Minn.1992)). The court found that the planning activity presented to the jury was strong evidence of premeditation. According to the postconviction court:

> The jury heard evidence that [Hawes] prepared deadly weapons to bring with when he went to confront Edwin. A black spray painted bat was recovered from the crime scene. The crossbow and arrows that were later recovered had been spray painted black. Latex gloves with black spray paint were found at [Hawes'] home. These gloves had [Hawes'] DNA on them.
>
> [O]ther weapons were found concealed around the property where Edwin was killed. A number of small maul-type hammers were found on the property. The owner of the property testified that these hammers were not his. A similar 3 or 4 pound hammer was found in the trunk of the Passat covered in Edwin's blood. The jury heard testimony and saw evidence that [Hawes] practiced using the [crossbow] at his place of business.
>
> . . . .
>
> [Hawes] also bought and distributed disposable cell-phones to be used during the "repossession" of the Passat. The jury was free to infer from this evidence that [Hawes] was engaged in more than a simple attempt to regain possession of the car.

(footnote omitted) (citations omitted). We conclude that the record supports the postconviction court's findings with respect to planning activity. The record also contains other evidence of planning activity on Hawes' part. The weapons used to kill Edwin were prepared in advance and some were concealed around the Weltman property. *See Moore*, 481 N.W.2d at 361 (explaining that moving a weapon to more accessible location is evidence of premedi-

tation). Additionally, Hawes testified that he and Romig arrived separately at Weltman's house, then hid while they waited for Edwin to arrive. *See State v. Alton,* 432 N.W.2d 754, 757 (Minn.1988) (noting that there was evidence of premeditation when the defendant waited for the victim to come home). Given the above evidence, we conclude that the evidence of planning activity introduced at trial that supports premeditation is considerable.

The postconviction court also relied on motive evidence in denying the petition. We have defined motive evidence as " 'facts about the defendant's prior relationship and conduct with the victim from which *motive* may be inferred.' " *Moua,* 678 N.W.2d at 40 (quoting *Moore,* 481 N.W.2d at 361). The postconviction court found that the feud between Hawes and Edwin related to Edwin's alleged theft from the lawn service business provided a motive for the murder. Specifically, the postconviction court noted that:

> Significant evidence of the ongoing controversy between [Hawes], other family members, and Edwin Hawes was presented throughout the trial. Ursula Weltman testified as to her knowledge of the "feud" between [Hawes] and Edwin Hawes. Ms. Weltman testified that [Hawes] left notes in Edwin's office at Hawes Lawn Service threatening his life. Ms. Weltman testified that she was scared for Edwin ... "because it felt like a very dangerous situation he was in."

(footnote omitted) (citations omitted). The record supports the postconviction court's findings with respect to motive. Moreover, Hawes' own testimony supports the postconviction court's findings that Hawes had a motive to kill. Hawes testified that he believed Edwin had embezzled a significant amount of money from Hawes Lawn Service and that Edwin's actions made him feel "betrayed, upset, mad, and angry." Further, Hawes' fixation with retrieving the Passat supports the conclusion that Hawes had a motive to kill Edwin. Hawes testified that he tried multiple strategies to repossess the Passat from Edwin, including changing the Hawes Lawn Service bylaws to preclude Edwin's use of the Passat and seeking the assistance of the Minneapolis and Golden Valley Police Departments. Each of these efforts was unsuccessful. Importantly, during cross-examination, Hawes admitted that he was the driver of the pickup truck that bumped the Passat in the incident about which Officer Buras testified. Edwin's death provided a means by which Hawes could regain possession of the Passat. Thus, we conclude that the jury heard ample evidence of Hawes' motive to kill his brother. *Moore,* 481 N.W.2d at 361 (noting that a victim's past conduct known to have angered the defendant, violent threats by the defendant directed toward the victim, and "plans or desires of the defendant which would be facilitated by the death of the victim" constitute motive evidence (citation omitted) (internal quotation marks omitted)). As with the evidence of planning activity relied on by the postconviction court, the evidence of motive is also considerable.

Although the postconviction court did not directly address the nature of the killing, the manner in which Edwin was killed is strong evidence of premeditation. *See Moore,* 481 N.W.2d at 361 (explaining that we assess the nature of the killing by examining whether the "manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design" (citation omitted) (internal quotation marks omitted)). The record indicates that Hawes and Romig planned and executed a surprise attack on Edwin. During that attack, Edwin was shot in the chest with a

crossbow, beaten about the head, thrown against the house, and run over by a car. When the attack was over, Hawes fled the scene in the Passat he had come to retrieve from Edwin. The evidence in the record with respect to the nature of the killing supports premeditation.

█ A defendant's actions after the murder are also considered when determining whether the killing was premeditated. *See State v. Kendell,* 723 N.W.2d 597, 606 (Minn.2006) (explaining that the defendant's behavior after the shootings was consistent with premeditation). In this case, after the attack on Edwin was finished, Hawes fled the scene without providing any aid or assistance to Edwin. *See State v. McArthur,* 730 N.W.2d 44, 50 (Minn.2007) (noting that "a defendant's concern with escape rather than with rendering aid to the victim" is relevant to the nature of the killing and is probative of premeditation). Later that evening, he returned with his sister to the area where the killing took place, parked his truck at a nearby golf course, walked to the scene of the killing, and attempted to clean the area and cover up the murder. When he was finished, he returned to his truck. As he walked back to the truck, he saw a law enforcement officer approaching. As a result, he threw the bottles of bleach and the crossbow into the woods to avoid suspicion. When stopped by the law enforcement officer, Hawes lied when the officer asked what Hawes was doing in the area. The next day, Hawes, Elizabeth Hawes, and Dorniden drove Edwin's body in the back of Romig's pickup truck to Hawes' farm near Westbrook, built a bonfire, and placed Edwin's body in that fire. The inferences to be drawn from Hawes' efforts to hide Edwin's body after the murder also provide strong support for the conclusion that Hawes premeditated Edwin's murder.

While Hawes claims that Edwin's unconfronted statements about which Officer Buras testified were the strongest evidence of premeditation presented at trial, the reality is, given the evidence of premeditation discussed above, they were not. Ursula Weltman testified about Hawes' notes threatening Edwin's life. Hawes was involved in preparing the weapons used to kill Edwin, including the crossbow, bringing the weapons to the scene, and hiding some of the weapons around the area where the murder took place. During cross-examination, Hawes admitted that he was involved in the ramming incident that was the subject of Officer Buras's testimony. Hawes also admitted that he watched his brother being attacked and then ran him over with a car without rendering aid or assistance to him. Individually, each of these facts is stronger evidence of premeditation than the unconfronted statements Officer Buras testified to at trial. When this evidence is viewed collectively, along with all of the other evidence from which premeditation can be inferred, Edwin's unconfronted statements regarding the ramming incident pale in comparison. Edwin's unconfronted statements were cumulative with respect to premeditation because they were simply one of the many pieces of evidence from which it could be inferred that Hawes premeditated Edwin's murder.

In summary, Hawes' ineffective-assistance-of-counsel claim fails under the second prong of *Strickland.* Given the evidence of premeditation set out above, including Hawes' confirmation of part of Officer Buras's testimony, we fail to see how, but for Hawes' attorneys' alleged errors in not objecting to the statements on hearsay and Confrontation Clause grounds, there exists a reasonable probability that the outcome of the trial would have been different. Therefore, we af-

firm the postconviction court's denial of relief based on Hawes' ineffective-assistance-of-counsel claim.

We now turn to Hawes' claim that the trial court erred when it admitted out-of-court statements made by Elizabeth Hawes and Dorniden to police in violation of the Confrontation Clause. The State filed a pretrial motion to admit statements made by Elizabeth Hawes to police at the Woodland Creek Golf Course as well as statements made by Elizabeth Hawes and Dorniden to police at Hawes' farm. The State argued that the statements were admissible under Minn. R. Evid. 801(d)(2)(E) because they were made in furtherance of a conspiracy. According to the State, the conspiracy was "the planning, execution, and cover-up of [Edwin's] murder."

The trial court ruled that the State met its burden of proving by a preponderance of the evidence that the statements were made in furtherance of a conspiracy. The court also ruled that statements made in furtherance of a conspiracy are "clearly an exception to *Crawford*" and added "for an appellate court's review" that the statements were not testimonial as they were elicited during an ongoing investigation by police to "try to figure out what had happened." Thus, the court concluded that the Confrontation Clause did not bar the admission of the statements.

■■■ We need not decide whether the trial court erred in admitting the statements because we conclude that any error was harmless beyond a reasonable doubt. Whether the admission of evidence violates a criminal defendant's Confrontation Clause rights is a question of law that we review de novo. *State v. Caulfield,* 722 N.W.2d 304, 308 (Minn.2006). A violation of the Confrontation Clause occurs when the accused is not afforded the right to

confront the witnesses against him. *See Crawford v. Washington,* 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (citing U.S. Const. amend. VI). However, "it is well settled that violations of the Confrontation Clause are subject to [a harmless error] analysis." *State v. Courtney,* 696 N.W.2d 73, 79 (Minn.2005). A new trial is not warranted if the violation is harmless beyond a reasonable doubt. *Id.* at 79–80. A Confrontation Clause error is harmless if "the guilty verdict actually rendered [is] 'surely unattributable' to the error." *State v. Wright,* 726 N.W.2d 464, 476 (Minn.2007) (quoting *Courtney,* 696 N.W.2d at 80).

> When determining whether the jury's verdict was surely unattributable to an error, we examine the record as a whole. In doing so, we consider the manner in which the evidence was presented, whether the evidence was highly persuasive, whether it was used in closing argument, and whether it was effectively countered by the defense.

*Id.* (quoting *Courtney,* 696 N.W.2d at 80). Overwhelming evidence of the defendant's guilt is often a very important factor in determining whether the error was harmless beyond a reasonable doubt. *See Townsend v. State,* 646 N.W.2d 218, 224 (Minn.2002).

■■■ Hawes challenges the admission of several statements made by Elizabeth Hawes at the Woodland Creek Golf course and several statements she made at Hawes' farm property. He also challenges the admission of several statements made by Dorniden at the farm property. First, Deputies Brian Pierson and Brett Froslee testified to statements made by Elizabeth Hawes to them at the Woodland Creek Golf Course the night that Edwin was killed. In his brief, Hawes claims that the following unconfronted statements were inadmissible:

1. It was [Elizabeth Hawes'] work truck in the parking lot.
2. She parked in the parking lot because she was having car problems and was worried about parking in the street.
3. She said she was in the neighborhood visiting [S.T.] regarding a cancer benefit. She said she had left her keys to the truck at [S.T.'s] house.
4. When Pierson questioned her story by pointing out that [Edwin] lived close by, and that he had a restraining order against her, she stuck with her original reasons for being at that location.
5. She later changed her story and indicated that she was there to repossess a car that belonged to the Hawes Lawn Care business. She said it was a Volkswagon [sic] and when she drove past it was at the house.
6. She also showed Pierson that she had keys to the car in her sock.
7. Pierson asked Elizabeth Hawes if she knew she had to stay away from [Edwin's] address and she admitted that she was aware of the restraining order.

(citations omitted). Hawes argues that the admission of these statements was not harmless beyond a reasonable doubt because they indicate that Elizabeth played an active role in Edwin's murder, which contradicts his testimony that Elizabeth was not involved in Edwin's death. In other words, Hawes asserts that the statements were harmful because they damaged his credibility.

Having carefully examined the record as a whole, we conclude that the admission of Elizabeth Hawes' statements from the golf course, if error, was harmless beyond a reasonable doubt. We first note that the State did not refer to the statements during its closing argument and there was nothing out of the ordinary in how the statements were presented at trial. Further, the statements are not highly persuasive evidence of Hawes' guilt because they are not inculpatory. None of the statements directly tie Hawes to Edwin's murder. Moreover, Hawes ignores the fact that Elizabeth Hawes' statements were consistent with, and indeed support, the central premise underlying his defense: that his purpose for going to Edwin's house was limited to retrieving the Passat and, therefore, he was not planning to kill Edwin. While it appears from the record that there was no effort by defense counsel to counter the statements, we note that a possible explanation for the lack of effort to do so is the fact that the statements were consistent with Hawes' theory of the case. We also note that, as a practical matter, any possible damage to Hawes' credibility stemming from Elizabeth Hawes' statements made at the golf course pales in comparison to the damage stemming from the lies Hawes admittedly told during his encounter with law enforcement officers at the golf course. Finally, as discussed above, the other evidence of Hawes' guilt is considerable. For these reasons, we conclude that the verdict rendered was surely unattributable to any error in the admission of the statements made by Elizabeth Hawes to law enforcement officers at the golf course.

■ Deputy Timothy Evers testified to a number of statements made by Elizabeth Hawes at Hawes' farm on the night of October 31, 2008. In his brief, Hawes claims that the following paraphrased statements from Deputy Evers' testimony were inadmissible:

1. She did not know where [Edwin] was and ... she was not close with him.

2. She was upset with [Edwin] for embezzling from the family.

3. When Evers[ ] asked her what was burning in the fire, she said she was burning garbage.

4. She told Evers that she and her brother [Hawes] went to [Edwin's] house to repossess a car and she was arrested for a restraining order violation.

5. She had only seen [Edwin] in court regarding the restraining order.

6. She and [Hawes] had seen the [Passat] in the driveway and they wanted to repossess it.

7. Elizabeth Hawes said she had no idea where [Edwin] was, she did not care for him, and she thought he might have been in a car accident and was possibly dead.

(citations omitted). Trooper Matthew Smith also testified about a statement Elizabeth Hawes made to him that same night. According to Trooper Smith, Elizabeth said to him, "that's not my brother in there" in reference to the bonfire. Hawes asserts that Elizabeth's statements, as testified to by Deputy Evers and Trooper Smith, were harmful because they also damaged his credibility. As with the statements Elizabeth made at the golf course, the manner in which these statements were presented, and the fact that the State did not rely on them in closing arguments weigh in favor of concluding that the statements were harmless. And, as with Elizabeth's statements at the golf course, these statements are neither directly inculpatory of Hawes nor highly persuasive evidence of Hawes' guilt. Moreover, in his testimony, Hawes admitted that Elizabeth went with him when he cleaned the crime scene and traveled with him and Dorniden to his farm property with knowledge that Edwin's body was in the back of the truck. In other words,

while Hawes denies that Elizabeth was present when Edwin was killed, he does not dispute that Elizabeth assisted in the attempted cover-up of Edwin's death. Therefore, we fail to see how Elizabeth's statements at the farm damaged Hawes' credibility because they were generally consistent with his testimony. That consistency between Elizabeth's statements and Hawes' testimony may again explain why Elizabeth's statements at the farm were not directly countered by Hawes at trial. Given these facts, in addition to the other considerable evidence of Hawes' guilt, we conclude that the verdict actually rendered was surely unattributable to any error in the admission of the statements made by Elizabeth to law enforcement officers at Hawes' farm property.

Finally, Hawes complains about testimony from Deputy Evers regarding statements made to Deputy Evers by Dorniden at Hawes' farm. In his brief, Hawes claims that the following statements were inadmissible:

1. They came up to the property to burn garbage and ... [Hawes] had ... woken her up and told her to pick up Elizabeth Hawes.

2. Elizabeth and [Hawes] had left the house earlier to start a fire at the farm house.

(citations omitted). The admission of Dorniden's farm-property statements was harmless for essentially the same reasons that the admission of Elizabeth Hawes' farm-property statements was harmless. Their presentation at trial was unremarkable, they were not highly persuasive, they were not directly inculpatory, they were not used by the State in closing argument, they were generally consistent with Hawes' own testimony, and, viewed in light of the substantial evidence of guilt, they could not have had a significant impact on the verdict actually rendered. We there-

fore conclude that the verdict actually rendered was surely unattributable to any error in the admission of the statements made by Dorniden to law enforcement officers at Hawes' farm property.

In sum, we hold that Hawes' ineffective-assistance-of-trial-counsel claim fails because Hawes has not shown that, but for his attorneys' alleged errors, there is a reasonable probability that the outcome of his trial would have been different. We also hold that any error in the admission of statements made by Elizabeth Hawes and Dorniden was harmless beyond a reasonable doubt. Therefore, we affirm Hawes' conviction.

Affirmed.