*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1372**

State of Minnesota,
Respondent,

vs.

Jason Paul Krieg,
Appellant.

**Filed August 4, 2014
Affirmed
Peterson, Judge**

Steele County District Court
File No. 74-CR-12-101

Lori Swanson, Attorney General, John B. Galus, Assistant Attorney General, St. Paul, Minnesota; and

Daniel A. McIntosh, Steele County Attorney, Owatonna, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Michael W. Kunkel, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Schellhas, Presiding Judge; Peterson, Judge; and Connolly, Judge.

UNPUBLISHED OPINION

**PETERSON**, Judge

In this appeal from convictions of attempted first- and second-degree murder, appellant argues that the circumstantial evidence was insufficient to prove intent and premeditation. We affirm.

## FACTS

After a shooting in a parking lot, appellant Jason Paul Krieg was charged with one count each of attempted first-degree murder—premeditated—in violation of Minn. Stat. § 609.185(a)(1) (2010); attempted second-degree murder—intentional—in violation of Minn. Stat. § 609.19, subd. 1(1) (2010); and drive-by shooting in violation of Minn. Stat. § 609.66, subd. 1e(b) (2010). Appellant waived his right to a jury trial, and the case was tried to the court.

About five months before the shooting, appellant and the victim had a dispute about $80 that the victim owed appellant for methamphetamine. The month before the shooting, the victim helped a friend retrieve some personal belongings, including a gaming system, from appellant's apartment, which caused another problem between appellant and the victim.

On the day of the shooting, the victim was driving a friend's car when it ran out of gas. The victim pushed the car into the parking lot of a fast-food restaurant in Medford and called his mother for a ride. While waiting for his mother, the victim talked with J.W., who was an acquaintance of appellant, and told J.W. about being stranded with the car.

On the same day, appellant's girlfriend was at appellant's apartment when he got home from work. After getting a phone call, appellant said he was going to Medford, and the girlfriend offered to drive him there. Appellant did not say why he was going to Medford, but he was pacing and seemed to be in a hurry to get there. The drive to Medford took about seven minutes. As they approached Medford, appellant became quieter and seemed anxious. At appellant's instruction, the girlfriend parked in the fast-food restaurant's parking lot.

When the victim came out of the restaurant and was about to get into his mother's car, he saw appellant approaching. Appellant said something like, "[W]ait a minute, f . . . er." The victim got into the car, and appellant continued approaching. Appellant was holding a long-barrel revolver in his right hand, and he began shooting at the car. Appellant rapidly fired five shots at the hood of the car and a sixth shot into the front passenger door.

The victim's mother testified that, as appellant approached the car, she heard him say, "I told you if I found you I was going to f . . . ing kill you." The mother described appellant as having the "gait of an angry person," stomping or storming and throwing his whole body into the motion. Appellant began shooting. He was holding the gun in his right hand. He had his right arm extended and was using his left hand to brace his right arm. The mother, who learned to shoot when she was ten, described appellant's posture as "loose." After firing a series of shots, appellant took "a broader, more solid stance and put both hands on the butt of the gun." Appellant then fired a second series of shots at the car. When the mother thought appellant had only a couple of rounds remaining, she

3

accelerated the car toward him, believing that the maneuver would interfere with his aim. As appellant moved away, he fired a final shot into the side of the car. All of the shots that appellant fired hit the car.

The restaurant's general manager witnessed the shooting. She testified that appellant began shooting when he was about 15 feet away from the car stopped in front of the restaurant. He continued moving toward the car as he fired.

Following the shooting, appellant's girlfriend drove him to a credit union where he withdrew $3,300 from his account. They went to the girlfriend's apartment, and the girlfriend disposed of appellant's revolver in her trash. Appellant told his girlfriend that he planned to leave town and instructed her to go to a store to buy him some personal items and a prepaid cellphone loaded with minutes. When the girlfriend returned from buying the items, appellant was gone. Police located appellant two days after the shooting and arrested him after he attempted to flee on foot.

A crime-scene team from the Minnesota Bureau of Criminal Apprehension (BCA) examined the victim's mother's car. The team found six bullet-entrance holes on the hood, bumper, and body of the car. Five of the six shots hit the front of the car's passenger side. Three of those five shots hit the hood, one hit the bumper, and another hit the headlight. The sixth shot hit the front passenger door.

The BCA team compared the height of three bullet holes on the hood to the point where the windshield meets the hood and also measured the distance from those holes to the rear of the front passenger seat. One hole was five and one-half inches below the windshield and seven feet, three inches from the rear of the front passenger seat. Another

4

was three and one-half inches below the windshield and seven feet, four inches from the rear of the front passenger seat. The third was five inches below the windshield and seven feet, eight inches from the rear of the front passenger seat. The trajectories of the shots that hit the hood varied by two to four degrees.

Firearms-expert Paul Smith testified that various factors can affect a shooter's accuracy, including the type of gun, the force of the trigger pull, the shooter's grip, body positioning, shooting experience, and movement by the target or the shooter. Smith also explained that recoil affects accuracy and that shooters tend to anticipate or fight recoil subconsciously by aiming the gun down at an angle to the intended target to offset anticipated recoil. Smith testified that, if a gun is aimed three degrees off center to the left or right, the bullet will be 3.1 inches off target at a distance of five feet, 4.4 inches off target at a distance of seven feet, 8.8 inches off target at a distance of 14 feet, and 13 inches off target at a distance of 21 feet.

The district court issued a written order finding appellant guilty of attempted first- and second-degree murder and not guilty of drive-by shooting. The district court denied appellant's motion to vacate his convictions or, alternatively, for a new trial and sentenced him to an executed term of 240 months in prison for attempted first-degree murder. This appeal followed.

**DECISION**

When considering a claim of insufficient evidence, we conduct "a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction," was sufficient to allow the jurors to reach the verdict that

5

they reached. *State v. Caine,* 746 N.W.2d 339, 356 (Minn. 2008) (quotation omitted). We must assume that "the [fact-finder] believed the State's witnesses and disbelieved the defense witnesses." *State v. Tscheu,* 758 N.W.2d 849, 858 (Minn. 2008). We will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the crime charged. *Bernhardt v. State,* 684 N.W.2d 465, 476-77 (Minn. 2004). When reviewing the sufficiency of the evidence, we apply the same standard to bench and jury trials. *In re Welfare of M.E.M.*, 674 N.W.2d 208, 215 (Minn. App. 2004).

We apply an elevated, two-step process in reviewing a conviction based on circumstantial evidence. *State v. Nelson,* 812 N.W.2d 184, 188 (Minn. App. 2012). "The first step is to identify the circumstances proved." *State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013). In doing so, we "defer to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State." *Id.* at 598–99 (quotation omitted). Second, we "examine independently the reasonableness of all inferences that might be drawn from the circumstances proved" to "determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis other than guilt, not simply whether the inferences that point to guilt are reasonable." *Id.* at 599 (quotations omitted). We give no deference to the fact-finder's choice between reasonable inferences. *Id.*

6

*Intent*

Intent to cause the death of a human being is an element of both attempted first- and second-degree murder. Minn. Stat. §§ 609.185(a)(1) (first-degree murder), .19, subd. 1(1) (second-degree murder). Intent "means that the actor either has the purpose to do the thing or cause the result specified or believes that the act, if successful, will cause the result." Minn. Stat. § 609.02, subd. 9(4) (2010).

The circumstances relevant to appellant's intent include the following. The victim and appellant had two disputes in the months before the shooting. On the day of the shooting, appellant came home from work in a happy mood. After getting a phone call, he was in a hurry to get to Medford. Near Medford, appellant's mood became quieter and anxious. In the parking lot, appellant approached the victim's mother's car in an aggressive manner brandishing a revolver. He stated to the victim, "[W]ait a minute, f . . . er," and "I told you if I found you I was going to f . . . ing kill you." When appellant was about 15 feet away from the car, he began firing shots at the car while continuing to approach the car. A total of six shots struck the car. Three of the shots hit the hood at elevations ranging from three and one-half to five and one-half inches below the windshield. After firing the first series of shots, appellant adopted a more solid stance, widening his feet and gripping the butt of the revolver with both hands. As the victim's mother drove toward appellant, he fired a final shot into the front passenger door. Appellant then left the scene and made preparations to leave town.

Appellant argues that he was attempting to gain "the upper hand in whatever came next" and that, if he intended to kill the victim, he would have fired before the victim got

7

into the car.  These arguments are based on speculation and not on evidence in the record. Considering the totality of the circumstances proved, the record does not support a rational hypothesis other than that appellant intended to kill the victim.[1]

*Premeditation*

Premeditation means "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission."  Minn. Stat. § 609.18 (2010).  Although premeditation does not require "proof of extensive planning or preparation to kill," the state must show that some appreciable time passed after the defendant formed the intent to kill during which the consideration, planning, preparation or determination required by Minn. Stat. § 609.18 took place.  *State v. Hurd,* 819 N.W.2d 591, 599 (Minn. 2012) (quotation omitted).  "The existence of premeditation is generally inferred from the totality of the circumstances surrounding the crime."  *Hawes v. State,* 826 N.W.2d 775, 783 (Minn. 2013) (quotation omitted).  We consider evidence relating to planning activity, the nature of the crime, and motive. *Id.*

Planning activity concerns facts about how and what the defendant did before an offense that show he was engaged in activity directed toward the offense.  *State v. Hughes,* 749 N.W.2d 307, 313 (Minn. 2008).  Obtaining the revolver from his apartment and bringing it to the shooting scene are facts that show that appellant engaged in activity before the shooting that was directed toward the shooting and support an inference of

---

[1] Because the evidence is sufficient to prove intent applying the circumstantial-evidence standard, we need not determine whether the district court erred in determining that appellant's "threat 'I told you if I found you I would f . . . ing kill you' made immediately prior to opening fire is direct evidence of intent to kill."

8

premeditation. *See State v. Chomnarith*, 654 N.W.2d 660, 665 (Minn. 2003) (concluding that defendant's acts of obtaining industrial-grade meat-cutting knife and using it to murder victim in driveway supported inference of premeditation).

The fact that appellant fired six shots at the car also indicates premeditation. *See State v. Kendell*, 723 N.W.2d 597, 606-07 (Minn. 2006) (noting that manner of killing, including firing multiple gunshots, can support an inference of premeditation and intent).

Regarding motive, the victim and appellant had two disputes in the months before the killing, and appellant said to the victim, "I told you if I found you I was going to f . . . ing kill you." *See State v. Lodermeier*, 539 N.W.2d 396, 398 (Minn. 1995) (stating that deterioration of defendant and victim's relationship may indicate premeditation).

Considering the totality of the circumstances proved, the record does not support a rational hypothesis other than premeditation.

**Affirmed.**