*This opinion is nonprecedential except as provided by
Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-1709**

State of Minnesota,
Respondent,

vs.

Deandre Dontae Turner,
Appellant.

**Filed November 18, 2024
Reversed and remanded
Cochran, Judge**

Hennepin County District Court
File No. 27-CR-21-14168

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Mark V. Griffin, Senior Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin J. Butler, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Frisch, Presiding Judge; Connolly, Judge; and Cochran, Judge.

**NONPRECEDENTIAL OPINION**

**COCHRAN**, Judge

In this direct appeal from the judgment of conviction for second-degree intentional murder, appellant Deandre Dontae Turner argues that his conviction must be reversed because he was deprived of a fair trial due to evidentiary errors and multiple instances of

prosecutorial misconduct. Because we conclude that evidentiary errors and prosecutorial misconduct cumulatively deprived Turner of a fair trial, we reverse his conviction and remand to the district court for a new trial.

**FACTS**

This appeal stems from Turner's conviction for second-degree intentional murder in the shooting death of Andrew McGinley (the victim) at a post-funeral gathering known as a "repass." The following facts summarize the evidence received during the jury trial.

On June 30, 2021, Turner attended a funeral and an outdoor repass at the Elk's Club in Minneapolis. Approximately two hundred or more people were at the repass, including members of the Vice Lords and Bloods groups. These groups were described as "[n]ot outright rivals but not friends either." During the repass, a physical altercation broke out between Samuel "Sharif" Willis, who was once affiliated with the Vice Lords, and the victim, who was connected to the Bloods. The victim grabbed Willis and pushed him against an outside wall of the Elk's Club, causing them both to fall to the ground. The victim landed on Willis. While they were intertwined on the ground, the victim was shot in the leg. At that point, others pulled the victim off of Willis and rushed Willis to his car. Shortly thereafter, someone shot the victim, fatally, in the back. Willis did not see who fired the shots that killed the victim.

Following the shooting, the Minneapolis police department opened an investigation into the victim's death. Police obtained surveillance video from a number of security cameras in the vicinity of the Elk's Club parking lot. The surveillance video from one of the cameras shows the victim limping across the parking lot after being shot in the leg. The

2

video then shows someone walk up behind the victim and shoot him multiple times in the back. The quality of the video is extremely poor; it was taken from an old video surveillance system. It is grainy, blurry, and choppy. As a result, the shooter is identifiable mainly by the color of his clothing—black pants and a shirt that was described at trial as red or burnt orange in color. Many people at the gathering were wearing colors associated with the different groups—red for the Bloods, and black and gold for the Vice Lords. The video does not clearly show the shooter's face.

A few weeks after the shooting, one of the victim's family members notified the police department of a potential witness, Corey Byrd. Sergeant Mark Suchta and Chief of Police Medaria Arradondo interviewed Byrd. Byrd did not offer Turner's name to the police during this interview. Instead, at the sergeant's suggestion, Byrd agreed that Turner shot the victim. At trial, Sergeant Suchta summarized his interview with Byrd as follows:

> So [Byrd] . . . was very hesitant on actually saying the name [of the shooter]. He was talking about his fear of not being protected by the police department—
> . . . .
> [Byrd] was in fear for his personal safety. And eventually we talked about how his name came to me. I said, "Hey, I spoke to a family member." And he said . . . "[the victim's brother]?" I said, "Yes, I spoke to [the brother]." And I said, "[the brother] told me that you told him that it was Deandre Turner." And [Byrd] said, "That's right." I said, "So Deandre Turner was the person that you saw shoot [the victim]?" And [Byrd] said yes.

Police officers were not able to locate any other witnesses who claimed that they saw the victim being shot in the back.

3

Police officers also did not find the gun that killed the victim or any forensic or DNA evidence linking a particular individual to the shooting. Officers did find discharged cartridge casings and fired bullets in the vicinity of the shooting, and an analysis of those items showed that they were all fired from the same gun. Based on a comparison of evidence from other crime scenes, police determined that the gun that fired the discharged cartridge casings found at the Elk's Club was also used in shootings in May 2022, December 2020, and July 2020. The state did not present any evidence suggesting that Turner was linked to any of the other shootings. There also was testimony that Turner was in custody by May 2022, the date of the last shooting.

Following their investigation, officers arrested Turner and respondent State of Minnesota charged him with second-degree intentional murder under Minn. Stat. § 609.19, subd. 1(1) (2020). He entered a plea of not guilty and the matter proceeded to a seven-day jury trial in July 2023.

At trial, the state presented testimony from a number of witnesses including investigating officers: Corey Byrd; Gayleen Jackson; and Samuel "Sharif" Willis. But the state relied primarily on the testimony of Sergeant Suchta; video evidence from the surveillance cameras; the out-of-court statement from Byrd agreeing with the sergeant's suggestion that Turner was the shooter; and testimony from Gayleen Jackson, who drove Turner home after the shooting.

The state introduced individual videos from the surveillance cameras in the vicinity of the shooting and the district court received them without objection. In addition to the individual videos, the state introduced a composite video, which showed the individual

4

videos pieced together. Over the repeated objection of defense counsel, Sergeant Suchta narrated the events depicted in the video as it was shown to the jury. During his initial summary of events depicted on the video, Sergeant Suchta described the shooting in question as follows: "*the fatal shooter*, the second shooter, *who we believe is Deandre Turner*, walks up behind [the victim] and shoots him several times in the back." (Emphasis added.) When the camera switched views in the composite video, Sergeant Suchta then identified "a person in black pants and red shirt" getting into Jackson's car and testified that this person was "the fatal shooter" of the victim who "[shot the victim] the second time, fatally." Following this narration, the prosecutor started the video over from the beginning so the jury could view it again. During the second viewing, the sergeant pointed to a person wearing "[b]urnt orange red and black pants" who shot the victim, "walk[ed] off camera," and then "walk[ed] back onto camera and . . . [got] into the front passenger seat of [Jackson's car]." However, despite the sergeant's testimony, the composite video does not show an unbroken sequence of the shooter firing at the victim and then getting into Jackson's car.

In addition to presenting video evidence as narrated by Sergeant Suchta, the state called Byrd to testify. Byrd, who knew Turner and was friends with Turner's father, testified that he was at the repass on June 30 and near the shooting when it occurred. At trial, he could not recall whether he saw Turner at the outdoor gathering, and he did not recall whether he saw anyone shoot the victim. He also did not remember speaking to the police about the shooting or telling them that he witnessed Turner shoot the victim. Given Byrd's testimony that he did not recall speaking with the police or any of the events

5

surrounding the shooting, the state moved to admit Byrd's out-of-court statement to Sergeant Suchta as substantive evidence under Minnesota Rule of Evidence 807—the residual hearsay exception. Over the objection of Turner's counsel, the district court ruled that Byrd's out-of-court statement to the police was admissible.

Following Byrd's testimony, the state called Jackson as a witness. Jackson testified that he was at the gathering and ran to his car after hearing the second set of shots. He did not see who killed the victim. As Jackson was driving away, he saw Turner walking on the sidewalk and offered to give him a ride home. Jackson did not see Turner with a gun while in his car.

The state also presented testimony from Willis, who stated that although he did not see who shot the victim in the back, he knew that the police were looking for Turner in connection with the victim's death. Willis testified that he spoke to Turner and advised him to turn himself in to the police if he was involved in the shooting. But he could not recall whether Turner said he had participated in the crime.

Turner testified in his own defense at trial. Turner acknowledged that, when he was arrested, he told the police that he was not at the repass. He further acknowledged that this statement was not accurate. Turner explained that he did so because there is a "code" not to speak to the police. He likewise testified that he denied knowing Willis, Byrd, or Jackson because, "[y]ou don't talk." At trial, Turner stated that he was in the general area of the shooting when it occurred, but he testified that he did not know who shot and killed the victim. And he denied shooting the victim, who he stated he did not know.

A couple of months after the shooting, Turner learned the police were looking for him in connection with the shooting. Turner testified that someone called him and encouraged him to speak to the police, although he could not remember who told him that the police wanted to speak with him about the shooting. Turner explained that he did not turn himself in because he was afraid that he would be falsely accused of a crime that he did not commit.

Following testimony, the district court instructed the jury and the attorneys gave their closing arguments. The jury found Turner guilty of second-degree murder and the district court sentenced him to prison for 330 months.

Turner appeals.

## DECISION

Turner argues that he is entitled to a new trial because the district court improperly admitted evidence and the prosecutor engaged in numerous types of misconduct during closing and rebuttal arguments. We agree that evidentiary errors and prosecutorial misconduct occurred during trial, and we further conclude that the cumulative effect of these errors deprived Turner of a fair trial.

### I. Evidentiary Errors

We begin by considering the alleged evidentiary errors. Turner urges us to reverse his second-degree-murder conviction because: (1) the district court committed reversible error by admitting Byrd's out-of-court statement under Minnesota Rule of Evidence 807, the residual exception to the hearsay rule; and (2) the district court erred by allowing

7

Sergeant Suchta to narrate the composite video and identify Turner as the person in the video who committed the crime.

Reviewing courts generally give deference to the evidentiary rulings of the district court and will not overturn such rulings absent a clear abuse of discretion. *State v. Dobbins*, 725 N.W.2d 492, 505 (Minn. 2006). "A district court abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." *State v. Vangrevenhof*, 941 N.W.2d 730, 736 (Minn. 2020) (quoting *State v. Guzman*, 892 N.W.2d 801, 810 (Minn. 2017)). "The defendant has the burden on appeal of proving both that the trial court abused its discretion by admitting the evidence and that the defendant was thereby prejudiced." *State v. Chomnarith*, 654 N.W.2d 660, 665 (Minn. 2003). An appellate court "will reverse the district court's ruling if the error substantially influenced the jury's decision." *State v. Loving*, 775 N.W.2d 872, 879 (Minn. 2009).

With these standards in mind, we consider Turner's evidentiary arguments in turn. We first address each of the alleged evidentiary errors. We then consider whether the identified errors, either individually or cumulatively, warrant a new trial.

*A.      Admission of Byrd's Out-of-Court Statement*

Turner argues that the district court clearly abused its discretion by admitting Byrd's out-of-court statement under rule 807 because the statement was inadmissible under the residual exception to the hearsay rule. We agree.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Minn. R. Evid. 801(c). Generally, hearsay is inadmissible at trial unless an exception set forth in the

8

rules of evidence applies. Minn. R. Evid. 802. An out-of-court statement not covered by a specific exception may still be admissible under the residual hearsay exception set forth in rule 807 if the statement has "equivalent circumstantial guarantees of trustworthiness" and meets the other requirements of the rule. Minn. R. Evid. 807. In considering whether a statement is admissible under rule 807, district courts conduct a two-step analysis. *State v. Hallmark*, 927 N.W.2d 281, 292 (Minn. 2019). First, the district court examines the totality of the circumstances to determine whether the hearsay statement has "equivalent circumstantial guarantees of trustworthiness." *Id.* Second, the district court determines whether the three enumerated requirements of rule 807 are met. *Id.* at 293.

Turner asserts that the district court clearly abused its discretion by admitting Byrd's out-of-court statement to Sergeant Suchta under rule 807 because this statement lacks the required "circumstantial guarantees of trustworthiness." Establishing circumstantial guarantees of trustworthiness involves an application of the totality-of-the-circumstances approach and "requires a careful balancing of all relevant circumstances surrounding the making of the statement." *Id.* at 292. Courts generally rely on factors, known as the *Ortlepp* factors, in evaluating whether a statement has circumstantial guarantees of trustworthiness. *Id.* This includes: (1) whether there is a Confrontation Clause issue, (2) whether "the statement is recorded, removing any real dispute about what the declarant said," (3) whether "the statement is against the declarant's penal interest," and (4) whether the statement is consistent with other evidence pointing strongly toward guilt. *Vangrevenhof*, 941 N.W.2d at 736 n.1; *State v. Ortlepp*, 363 N.W.2d 39, 44 (Minn. 1985). Since deciding *Ortlepp*, the supreme court has articulated additional relevant factors, such

9

as whether the statement was made voluntarily; whether it was made under oath and subject to cross-examination; the declarant's motivation for making the statement, personal knowledge, and relationship to the parties in the litigation; whether the declarant recanted; whether there is corroborating evidence; and the declarant's reputation for honesty. *Vangrevenhof*, 941 N.W.2d at 736; *see also State v. Robinson*, 718 N.W.2d 400, 408-09 (Minn. 2006) (instructing that the *Ortlepp* factors are nonexclusive).

Here, the district court permitted Sergeant Suchta to testify to Byrd's out-of-court statement identifying Turner as the shooter and admitted the testimony under rule 807. Specifically, Sergeant Suchta testified that, during the police interview, the sergeant told Byrd that "[the victim's family member] told me that you told him that it was Deandre Turner." And, according to the sergeant, Byrd responded "yes." Sergeant Suchta testified that he then said to Byrd, "So Deandre Turner was the person that you saw shoot [the victim]?" Byrd responded, "yes." The district court admitted the testimony after Byrd testified at trial that he could not recall the events surrounding the shooting or the police interview.

In deciding to admit Byrd's statement, the district court primarily considered the *Ortlepp* factors and determined that Byrd's prior statement had circumstantial guarantees of trustworthiness. The district court determined that: (1) there was no Confrontation Clause issue because Byrd was in custody at the time of Turner's trial and subject to direct- and cross-examination; (2) Byrd's statement to the police was recorded, (3) his statements were against his penal interest because, although Byrd was not subject to possible prosecution, he was hostile toward the prosecution and did not want to be in court; and

10

(4) Byrd's statement was "consistent with the State's other evidence that pointed strongly towards the defendant's guilt," such as the surveillance videos and Jackson's testimony. The district court also recognized that its analysis of the trustworthiness of Byrd's statement was not limited to the *Ortlepp* factors and determined that there was no other evidence in the record that would make Byrd's statement "untrustworthy."

Upon review, we agree with the district court that the record supports its findings on the first and second *Ortlepp* factors, but we conclude that the district court abused its discretion in its determination on the third and fourth factors. The district court's analysis of the third and fourth factors is not supported by the record and is contrary to law.

As to the third factor, the district court found that Byrd's statements were against his penal interest because he was hostile toward the prosecution and "did not want to be [in court]." Generally, this factor requires a person's statements to be against their own penal interest. *State v. Whiteside*, 400 N.W.2d 140, 146 (Minn. App. 1987), *rev. denied* (Minn. Mar. 18, 1987). There is no dispute that Byrd's statement was not contrary to his own penal interest. This element also may be satisfied if the declarant's statements are against their social interest in maintaining their relationship with the defendant. *See id.* (concluding that a statement by defendant's girlfriend implicating defendant was against her penal interests); *see also State v. Plantin*, 682 N.W.2d 653, 659 (Minn. App. 2004) (noting that this element may be satisfied "if the declarant is hostile to the state and supportive of the defendant"), *rev. denied* (Minn. Sept. 29, 2004). The record also does not support that Byrd's statement was against his social interest in maintaining a relationship with Turner. Although Byrd testified that he knew Turner and was friends

11

with Turner's father, the record does not show that Byrd was interested in maintaining a relationship with the defendant or was supportive of the defendant. Instead, the record shows that Byrd was hesitant to testify because he feared for his safety and the safety of his family. We are aware of no caselaw that holds that a "statement is against the declarant's penal interest" when the declarant testifies that he is hesitant to testify due to safety concerns. Consequently, the record does not support the district court's finding that Byrd's statement was against his penal interest.

We are likewise not persuaded that the evidence supports the district court's findings on the fourth factor. While Byrd's out-of-court statement is consistent with the state's theory of the case that Turner was the fatal shooter, the record reflects that the other evidence at trial did not "point[ ] strongly toward" Turner's guilt. *Ortlepp*, 363 N.W.2d at 44. First, there was no testimony at trial from any eyewitness who could identify the fatal shooter or who saw the victim get shot in the back. The only evidence identifying the shooter was Byrd's out-of-court statement. Second, the surveillance video—on which the state placed great reliance at trial and during closing—is grainy, blurry, and hard to follow. The video does show the shooter wearing dark pants and a burnt orange or red shirt, which is similar to what Turner was reportedly wearing at the repass. But Willis testified that other attendees also wore red or burnt orange clothing at the repass. Moreover, the video is not clear enough to identify the face of the shooter. And the composite video that the state relied upon to argue that Turner was the shooter and got in Jackson's car after the shooting does not show a continuous series of events. Lastly, the testimony from Jackson about events following the shooting does not tie Turner to the shooting. Jackson testified

12

that he picked up Turner sometime after the shooting, but Jackson also testified that he did not see the fatal shooting. He also did not see Turner with a gun while in his car. Thus, while Byrd's out-of-court statement superficially aligns with the state's case, the other evidence emphasized by the state neither points strongly toward guilt nor supports the district court's trustworthiness finding under the fourth *Ortlepp* factor.

Finally, while the district court focused primarily on the *Ortlepp* factors, we note that additional relevant factors call into question the trustworthiness of Byrd's out-of-court statement. *See Vangrevenhof*, 941 N.W.2d at 736 (articulating additional relevant factors). Importantly, while Byrd made the statement voluntarily, he did not offer Turner as the shooter on his own initiative. Instead, during the police interview, Byrd merely agreed with Sergeant Suchta that Turner shot the victim in the back. And, after stating his agreement, Byrd did not give specific or detailed information about the shooting. *Cf. Hallmark*, 927 N.W.2d at 295 (determining that a statement had guarantees of trustworthiness where the declarant gave "specific and detailed" information about a crime and spoke "voluntarily to the police in response to open-ended questions"). Other factors also weigh against a reliability finding. For example, Byrd's statement during the police interview was not made under oath or subject to cross-examination. Moreover, although he did not directly recant his statement, he claimed at trial that he did not recall making the statement to the police officers. Finally, several other factors—such as Byrd's motivation for making the statement and Byrd's reputation for honesty—are unknown or neutral. Taken together, the totality of the circumstances does not point toward Byrd's statement having the necessary guarantees of trustworthiness to be admitted under rule 807.

13

Consequently, we conclude that Byrd's out-of-court statement failed to show "circumstantial guarantees of trustworthiness" and the district court clearly abused its discretion by admitting this statement as substantive evidence under the residual hearsay exception.[1] *Hallmark*, 927 N.W.2d at 292 (quotation omitted).

B. *Narration and Identification of Surveillance Footage*

Turner next argues that the district court abused its discretion by permitting Sergeant Suchta to narrate the composite surveillance video for the jury and by allowing Sergeant Suchta to identify Turner as "the fatal shooter" while narrating. We discern no abuse of discretion by the district court in permitting the narration, but we conclude that Suchta's testimony identifying Turner as the shooter was impermissible because it went beyond narrating the events depicted in the video and effectively gave the sergeant's opinion as to Turner's guilt.

As an initial matter, we note that nonprecedential authority from this court supports a conclusion that an officer may provide lay-opinion testimony about the contents of a surveillance video.[2] *See, e.g.*, *State v. Williams*, No. A22-1573, 2024 WL 1044815, at *8 (Minn. App. Mar. 11, 2024) (determining that the district court did not err by allowing a detective to narrate a security-camera video); *State v. Kasim*, No. 18-1322, 2019 WL

_____

[1] Because we determine that Byrd's statement fails at the first step of the residual exception's admissibility inquiry, we do not consider whether the statement satisfied rule 807. *See Hallmark*, 927 N.W.2d at 292 (noting that "[t]he decision to admit hearsay statements under Rule 807 has two steps").

[2] We cite these cases solely for their persuasive value. *See* Minn. R. Civ. App. P. 136.01, subd. 1(c) ("Nonprecedential opinions and order opinions are not binding authority except as law of the case, res judicata or collateral estoppel, but nonprecedential opinions may be cited as persuasive authority.").

2415974, *4-6 (Minn. App. June 10, 2019) (holding that an officer's testimony regarding the events in a video "was admissible lay-opinion testimony"). As this court explained in *Kasim*, lay opinions that are rationally based on a witness's perceptions are "admissible if they are helpful to a jury." 2019 WL 2415974 at *4 (citing *State v. Washington*, 725 N.W.2d 125, 137 (Minn. App. 2006), *rev. denied* (Minn. Mar. 20, 2007)); *see also* Minn. R. Evid. 701. In the context of a police investigation into a crime, an officer's testimony at trial explaining how video surveillance was used to identify a suspect has been found to be admissible lay-opinion testimony if it is "rationally based" on the officer's perceptions and helpful to the jury. *Id.* We find this reasoning persuasive. With the exception of Sergeant Suchta's identification of Turner as discussed below, we conclude that Sergeant Suchta's narration was properly admitted as lay-opinion testimony because his narration helped the jury to understand the events captured on the surveillance videos.

We reach a different conclusion regarding Sergeant Suchta's identification of Turner as the "fatal shooter." We conclude that the district court abused its discretion by permitting Sergeant Suchta to testify that he thought Turner was responsible for the shooting and, by extension, guilty of the crime because doing so was contrary to law. *See State v. Garland*, 942 N.W.2d 732, 742 (Minn. 2020) (advising that a district court abuses its discretion when its decision is based on an erroneous view of the law). Our analysis is guided by *State v. Hogetvedt*, in which we addressed a similar issue and concluded reversal of the defendant's third-degree assault conviction was required. 623 N.W.2d 909, 911 (Minn. App. 2001), *rev. denied* (Minn. May 29, 2001). In *Hogetvedt*, the prosecutor asked a police officer on direct examination about the officer's discussion with the victim. *Id.* at

15

915. The officer responded, "Well, I told [the victim] that I believed it was [defendant] that assaulted her." *Id.* The district court struck the officer's statement from the record and instructed the jury that the officer's opinion was not evidence. *Id.* On appeal, we characterized the officer's testimony as "egregious" because the officer essentially "told the jury he believed appellant was guilty of assaulting [the victim]." *Id.* Given the officer's status as a police officer, we determined that this "particularly harmful" testimony unduly influenced the jury and we reversed and remanded for a new trial. *Id.* at 915-16.

Similarly, here, Sergeant Suchta identified Turner as the "fatal shooter" and in effect told the jury that he believed that Turner was guilty of murdering the victim. Toward the beginning of his narration of the composite video, Sergeant Suchta stated: "*the fatal shooter*, the second shooter, *who we believe is Deandre Turner*, walks up behind [the victim] and shoots him several times in the back." (Emphasis added.) When the camera switched views in the composite video, Sergeant Suchta then identified "a person in black pants and red shirt" getting into Jackson's car and testified that this person was "the fatal shooter" of the victim who "[shot the victim] the second time, fatally." The prosecutor later played the composite video for the jury a second time and the sergeant again identified Turner as the "shooter" who got into Jackson's car. While the sergeant did not provide an express opinion regarding the ultimate issue—that Turner was guilty of murder—he repeatedly referred to Turner as the fatal shooter. Through his testimony, Sergeant Suchta in effect gave his opinion on the ultimate issue of who was guilty of the crime at issue.

As we noted in *Hogetvedt*, a district court must be cautious about the influence of an officer's opinions because they may carry high persuasive value. *See id.* at 915 (stating

16

that, "[g]iven [the officer]'s status as a police officer," his opinion as to guilt "may have unduly influenced the jury"). Here, our concern is heightened because Sergeant Suchta did not personally observe the shooting. *See id.* at 911-12, 916 (reversing conviction where an officer, who did not witness the offense, testified that accused "assaulted" the victim).

We acknowledge that the district court instructed the jury to rely on its own understanding of the events depicted in the video, and that "[j]urors are presumed to follow instructions." *State v. James*, 520 N.W.2d 399, 405 (Minn. 1994). Despite this safeguard, we conclude that the district court's decision to allow the sergeant to identify Turner as the fatal shooter during his narration of the video evidence constituted a clear abuse of discretion because it was based on an erroneous view of the law. *See Hogetvedt*, 623 N.W.2d at 911.[3]

C.      *Denial of a Fair Trial*

Having concluded that the district court abused its discretion by admitting Byrd's out-of-court statement and by permitting Sergeant Suchta to identify Turner as the fatal shooter, we next consider whether these errors justify reversing Turner's conviction and remanding for a new trial. Even if a district court erroneously admits evidence, an appellate court will not reverse a conviction if the error was harmless. *Loving*, 775 N.W.2d at 879.

---

[3] We note defense counsel objected to the narration but did not specifically object to Sergeant Suchta's identification of Turner as the fatal shooter. While the parties addressed the issue under the abuse-of-discretion standard, we would reach the same result even if we were to review the issue under the plain-error standard because the district court plainly erred by permitting the sergeant to identify Turner as the fatal shooter and, as discussed below, the error affected Turner's substantial rights. *See State v. Myhre*, 875 N.W.2d 799, 804 (Minn. 2016) (setting forth elements of the plain-error test).

An error is harmless "[w]hen there is no reasonable possibility that it substantially influenced the jury's decision." *State v. Harvey*, 932 N.W.2d 792, 810 (Minn. 2019) (quotation omitted). To assess the impact of improperly admitted evidence, a reviewing court looks at the entire record and considers such factors as: "(1) the manner in which the party presented the evidence, (2) whether the evidence was highly persuasive, (3) whether the party who offered the evidence used it in closing argument, and (4) whether the defense effectively countered the evidence." *State v. Smith*, 940 N.W.2d 497, 505 (Minn. 2020).

After reviewing the relevant factors, we conclude that Turner's substantial rights were affected by both the admission of Byrd's out-of-court statement and the sergeant's identification of Turner as the shooter because there is a reasonable probability that each significantly affected the jury's verdict. *See, e.g.*, *State v. Segura*, 2 N.W.3d 142, 161 (Minn. 2024). As to the first *Smith* factor, in both instances, the evidence was presented through a police officer. Sergeant Suchta testified about his interview with Byrd and also identified Turner as the person he believed to be the fatal shooter. Second, the out-of-court statement from Byrd and the identification evidence were both highly persuasive. Byrd was the only witness the state identified who saw the second shooting and the sergeant's repeated references to Turner as the "fatal shooter" suggested to the jury that the sergeant believed that Turner was guilty.[4] *See Hogetvedt*, 623 N.W.2d at 915 (stating that, "[g]iven [the officer]'s status as a police officer," his opinion as to guilt "may have unduly

---

[4] The district court noted that the decision to admit Byrd's statement was "consequential for [a] determination" of the case and "could tilt the outcome of a trial." While we conclude that an error occurred, we acknowledge that the district court judge in this case was faced with a particularly difficult judgment call and did not make its evidentiary decisions lightly.

influenced the jury"). Third, the state discussed Byrd's out-of-court statement and the video in his closing and rebuttal arguments. Fourth, and finally, given the pervasiveness of this evidence, we are not satisfied that the defense was able to effectively counter Byrd's statement or Sergeant Suchta's identification. Thus, there is a reasonable possibility that each piece of improperly admitted evidence independently had a substantial impact on the verdict.

Moreover, even assuming that neither error was prejudicial by itself, the cumulative effect of these errors deprived Turner of a fair trial. A defendant "is entitled to a new trial if the errors, when taken cumulatively, had the effect of denying [the defendant] a fair trial." *State v. Yang*, 774 N.W.2d 539, 560 (Minn. 2009) (quotation omitted); *see also State v. Keaton*, 589 N.W.2d 85, 91 (Minn. 1998) (noting that a reviewing court need not determine whether an error standing alone would warrant a new trial if the "errors, taken cumulatively, deprived the appellant of his right to a fair trial"). "When considering a claim of cumulative error, we look to the egregiousness of the errors and the strength of the state's case. Where the evidence of guilt is strong, and the case is not close factually, we are less inclined to order a new trial for cumulative error." *State v. Williams*, 908 N.W.2d 362, 366 (Minn. 2018) (quotations and citation omitted).

We conclude that the evidentiary errors, individually and collectively, deprived Turner of a fair trial. Byrd's out-of-court statement should not have come in as substantive evidence because it lacked circumstantial guarantees of trustworthiness, and Sergeant Suchta should not have been permitted to identify Turner as the shooter. Moreover, the remaining evidence concerning the identity of the shooter was weak. Officers did not find

19

a gun or forensic evidence linking Turner to the shooting. The state did not call any eyewitnesses who identified Turner at trial as the person who shot the victim in the back or who saw him with a weapon. And although Byrd took the stand, he could not recall the events surrounding the shooting or his conversation with the officers. Additionally, the surveillance video showing the shooting is blurry, grainy, and poor. And the composite video created by the police department is choppy, is of poor quality, and does not show a continuous series of events.

Given the cumulative errors and the weakness of the remaining evidence of guilt, we conclude that this is the rare case warranting reversal. *See State v. Fraga*, 898 N.W.2d 263, 278 (Minn. 2017) (stating that a defendant may be entitled to a new trial "in rare cases where the errors, when taken cumulatively, have the effect of denying [the] appellant a fair trial" (quotation omitted)); *see also Williams*, 2024 WL 1044815, at *1 (reversing and remanding where the cumulative effect of evidentiary errors deprived the defendant of a fair trial). Therefore, we are compelled to reverse Turner's conviction and remand for a new trial based on the evidentiary errors.

## II.     Prosecutorial Misconduct

Turner argues that he also is entitled to a new trial based on several instances of unobjected-to prosecutorial misconduct that occurred during the state's closing argument. He contends that the prosecutorial misconduct provides an independent basis for a new trial. We agree and conclude that the prosecutor's pervasive misconduct by itself requires a new trial.

The "overarching concern regarding prosecutorial misconduct" is that it may deprive a defendant of a fair trial. *State v. Ramey*, 721 N.W.2d 294, 300 (Minn. 2006). A prosecutor engages in misconduct by violating "clear or established standards of conduct" such as "rules, laws, orders by a district court, or clear commands in this state's case law." *State v. McCray*, 753 N.W.2d 746, 751 (Minn. 2008) (quoting *State v. Fields*, 730 N.W.2d 777, 782 (Minn. 2007)). "When assessing alleged prosecutorial misconduct during a closing argument, we look to the closing argument as a whole, rather than to selected phrases and remarks." *Id.* (quotation omitted).

Because Turner did not object at trial to the alleged prosecutorial misconduct, we apply a modified plain-error test as our standard of review. *Ramey*, 721 N.W.2d at 302. To succeed under the modified plain-error test, the appellant must show that the prosecutor's conduct constitutes error that is plain. *Id.* "An error is plain if it was clear or obvious," which generally "is shown if the error contravenes case law, a rule, or a standard of conduct." *Id.* If appellant establishes plain error, the burden then shifts to the state to demonstrate that appellant's substantial rights were not affected. *Id.* If the state fails to meet its burden, a reviewing court may reverse the appellant's conviction when the fairness, integrity, or public reputation of the judicial proceedings is seriously affected by the prosecutor's plain error. *State v. Kelly*, 668 N.W.2d 39, 43 (Minn. App. 2003) (citation omitted). With this standard of review in mind, we turn to Turner's claims of prosecutorial misconduct.

A.    *Alleged Prosecutorial Misconduct*

Turner contends that the prosecutor engaged in five different types of prosecutorial misconduct, each amounting to plain error. We conclude that Turner has met his burden to show plain error for four of the five claims.

i.    *Referring to Witnesses Who Were Not Called to Testify*

Turner first argues that the prosecutor committed misconduct that is plainly erroneous by referring to witnesses who did not testify at trial. It is well established that "[i]t is improper conduct for a prosecutor to refer to a witness who was not called." *State v. Page*, 386 N.W.2d 330, 336 (Minn. App. 1986), *rev. denied* (Minn. June 30, 1986); *see also State v. Shupe*, 196 N.W.2d 127, 128 (Minn. 1972) (determining that the prosecutor committed misconduct by alluding to witnesses who were not called at trial due to illness).

Here, the prosecutor told the jury during closing argument that "[d]ozens of people saw" Turner shoot the victim but those eyewitnesses did not testify due to a "code of the streets" not to "snitch." He continued, "This is not a whodunit. This is not a mystery man case. It was [Turner]. Everyone who was there that day who knows him knows he did it. We gave you all the witnesses we could who would say it." By asserting that there were "[d]ozens" of eyewitnesses to the shooting who the state did not call to testify at trial, the prosecutor engaged in misconduct that was plainly erroneous. At the time of trial, the law was clear that a prosecutor was prohibited from referring to witnesses who are not called to testify. *See Page*, 386 N.W.2d at 336.

22

### ii. *Putting Oneself in the Defendant's Shoes*

Turner next argues that the prosecutor engaged in plainly erroneous misconduct by asking the jurors to put themselves in Turner's shoes. To support this argument, Turner points to the prosecutor's statement: "Think about the last time you got a phone call saying, 'Hey, dude, you're wanted for murder,' and think about if you would remember who it is that called you and said that." The prosecutor made this statement after pointing out to the jury that Turner did not remember whom had called him to let him know that the police were looking for him in connection with the shooting.

Generally, a prosecutor may not "urge the jurors to put themselves in the defendant's shoes." *State v. Williams*, 525 N.W.2d 538, 549 (Minn. 1994). In *Williams*, the prosecutor encouraged the jurors "to put themselves in the defendant's shoes and ask themselves if they ever had traveled and opened their luggage to 'just magically find something in your bag that you hadn't put in there when you packed.'" *Id.* The supreme court noted that, while jurors can bring in their own experiences, "it is improper for the prosecutor to urge the jurors to look at their own experiences as proof that the defendant's defense is not credible." *Id.* Here, the prosecutor asked the jury to use their own experience in a manner like that rebuked by the supreme court in *Williams* and did so to call into question Turner's credibility. We therefore agree with Turner that the prosecutor committed plainly erroneous misconduct by urging the jurors to place themselves in Turner's shoes.

### iii. Other Shootings and Gang Affiliations

Turner also argues that the prosecutor improperly suggested that Turner was in a gang and potentially responsible for other shootings committed with the same gun that was used in the fatal shooting in this case. We begin by addressing the prosecutor's reference to the other shootings. We discern no plain error in this regard because the other shootings were discussed by the prosecutor only in response to defense counsel's comments about the same. "The prosecutor has the right to fairly meet the arguments of the defendant." *State v. Martin*, 773 N.W.2d 89, 106 (Minn. 2009).

But we agree with Turner that the prosecutor plainly erred by insinuating, without evidence, that Turner was in a gang. In his closing, the prosecutor argued that, "[w]e certainly didn't hear any credible character evidence that he's not violent or that he's not in a gang." A closing argument "must be based on the evidence produced at trial, or the reasonable inferences from that evidence." *State v. Porter*, 526 N.W.2d 359, 363 (Minn. 1995). It is improper to make negative references to the defendant's character beyond the witness's testimony. *State v. Googins*, 255 N.W.2d 805, 806-07 (Minn. 1977). Disparaging the defendant or defense witnesses is prosecutorial misconduct. *State v. Bailey*, 677 N.W.2d 380, 403-04 (Minn. 2004). Here, Turner testified that he was not in a gang. The state did not present any evidence that Turner was affiliated with a gang. The prosecutor's insinuation that Turner may have been violent or in a gang—simply because there was not "any credible character evidence" to the contrary—was a plainly erroneous, negative reference to Turner's character beyond the witness testimony. The prosecutor's conduct in this regard constitutes misconduct.

### iv. Alignment with the Jury

Turner next asserts that the prosecutor aligned himself with the jury by using "we" statements. "[A] prosecutor is not a member of the jury, so to use 'we' and 'us' is inappropriate." *State v. Mayhorn*, 720 N.W.2d 776, 790 (Minn. 2006). But a prosecutor's use of "we" statements to summarize or explain the evidence does not necessarily qualify as prosecutorial misconduct. *See State v. Roman Nose*, 667 N.W.2d 386, 401-02 (Minn. 2003) (holding that prosecutor's comments using "we" statements to summarize evidence were not prosecutorial misconduct). Considering the argument as a whole, we do not view the isolated nature of the prosecutor's use of "we" statements as constituting misconduct.

### v. Drug Use

Finally, Turner asserts that the prosecutor engaged in misconduct when he claimed without evidence that Turner was "high" at the gathering. At trial, Turner testified that he had a beer or two at the gathering, but there is no evidence that he was "drunk" or "high." Nevertheless, the prosecutor argued in his closing that, "[Turner] was drunk, [and] probably high" before the shooting. A closing argument "must be based on the evidence produced at trial, or the reasonable inferences from that evidence." *Porter*, 526 N.W.2d at 363. The prosecutor's accusation of drug use, which was not supported by the record evidence, was improper and constitutes plain error.

### B. Prejudice

Having concluded that the prosecutor committed several types of misconduct that constitute plain error, we next consider whether the state has met its the burden to show

that the prosecutor's misconduct did not affect Turner's substantial rights. Prosecutorial misconduct affects a defendant's substantial rights "if there is a reasonable likelihood that the absence of misconduct would have had a significant effect on the jury's verdict." *State v. Davis*, 735 N.W.2d 674, 681-82 (Minn. 2007). To determine whether there is a reasonable likelihood that the prosecutor's error had a significant effect on the verdict, "we consider the strength of the evidence against the defendant, the pervasiveness of the improper suggestions, and whether the defendant had an opportunity to (or made efforts to) rebut the improper suggestions." *Id.* at 682.

Here, the state has not satisfied its burden of showing that the misconduct did not affect Turner's substantial rights. *Ramey*, 721 N.W.2d at 302. We reach this conclusion for the following reasons. First, the state's case was weak. At trial, the prosecutor did not present any eyewitness testimony, forensic evidence, or clear surveillance footage identifying Turner as the shooter. The only evidence identifying Turner as the shooter was Byrd's improperly admitted out-of-court statement, which was made at the suggestion of Sergeant Suchta. Next, the prosecutor's misconduct was pervasive. In closing and rebuttal arguments that totaled less than 17 typed transcript pages, the prosecutor engaged in four different types of plainly erroneous misconduct, including: (1) suggesting that numerous people saw Turner shoot the victim but claiming that the witnesses were not willing to testify; (2) encouraging the jurors to place themselves in Turner's shoes to call into question Turner's credibility; (3) insinuating—without evidence—that Turner was in a gang; and (4) asserting that Turner was drunk and "high" at the gathering without evidentiary support. Lastly, while the defense may have attempted to counter the

26

prosecutor's improper suggestions by arguing that Turner "was the scapegoat for the murder," that attempt was overshadowed by the prosecutor's multiple instances of misconduct throughout closing and rebuttal. Consequently, we conclude that the state failed to satisfy its burden of showing that the prosecutor's misconduct did not affect Turner's substantial rights.

### C. Fairness and Integrity

Finally, we consider whether we must reverse because the prejudicial errors seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Kelly*, 668 N.W.2d at 43. We conclude that a new trial is warranted under this exacting standard.

"[I]n rare cases, [] the cumulative effect of trial errors can deprive a defendant of his constitutional right to a fair trial when the errors and indiscretions, none of which alone might have been enough to tip the scales, operate to the defendant's prejudice by producing a biased jury." *State v. Davis*, 820 N.W.2d 525, 538 (Minn. 2012) (quotation omitted) (involving unobjected-to errors). Considering the multiple plain errors engaged in by the prosecutor during closing arguments and the cumulative impact of those errors on Turner's substantial rights, we agree that Turner is entitled to a new trial because failure to grant one would cause the public to seriously question the fairness and integrity of our judicial system. Although we conclude that the prosecutorial misconduct alone requires a new trial, we note that our decision is bolstered by the prejudicial effect of the evidentiary errors discussed above—which also necessitate a new trial.

We recognize the seriousness of reversing a second-degree murder conviction and we do not take this action lightly. But we are obligated to follow the law and the record here persuades us that Turner was deprived of a fair trial. *See Segura*, 2 N.W.3d at 169 (acknowledging the difficulties on a victim's family, the community, and the court in reversing and remanding a defendant's murder and kidnapping convictions); *State v. McCormick*, 835 N.W.2d 498, 510 (Minn. App. 2013) (describing the court of appeals as "an error-correcting court," which is limited to finding the law and applying it to the facts (quotation omitted)), *rev. denied* (Minn. Oct. 15, 2013). Therefore, we are duty bound to reverse Turner's conviction and remand for further proceedings.

**Reversed and remanded.**